ALBERT J. ROCKWELL and another, Executors of David M. Hard, deceased, Appellants, *v.* WILLIAM B. NEARING, Respondent.

Chapter 459 of the Laws of 1862 is unconstitutional, so far as it authorizes the seizure and sale, without judicial process, of animals found trespassing within a private inclosure.

The legislature transcends the limits of its authority when it enacts that one citizen may take, hold and sell the property of another without notice to the owner, or without process or warrant, as a mere penalty for a private trespass.

Such summary proceedings as the common law recognized, and such as were authorized by statute prior to the adoption of the bill of rights, may be regarded as "due process of law;" but no form of proceedings then existed which authorized the summary confiscation of private property as a punishment for a mere trespass.

The proceedings in the case of strays, and of cattle taken *damage-feasant*, are remedial in their nature; but those instituted by the act in question are purely penal, and to the extent above indicated they are clearly within the prohibition of the Constitution.

*It seems* that even when the animal is seized on the public highway, the captor would be liable if he omitted to give notice to a known owner, or if he procured the animal to be sold without producing it for the inspection of the bidders.

APPEAL from a decision of the Supreme Court in the sixth judicial district, affirming the reversal by the Otsego County Court of a judgment in favor of a testator before a magistrate.

The complaint contained two counts; one alleged the wrongful taking, and the other the wrongful conversion, by the defendant, of a cow belonging to the plaintiff.

The answer put these allegations in issue, and alleged, by way of justification, that the defendant took the cow into his custody on the 17th of May, 1864, under the authority of chapter 459 of the Laws of 1862, while she was running at large on the highway opposite his land; that he immediately notified a commissioner of highways of the town, who thereupon advertised her for sale at the defendant's residence on the 3d of June, by posting notices of such sale; that on the 27th of May the cow was either stolen or taken

from his possession without his connivance, and that he had made diligent search for her without finding her.

It was proved on the trial that the parties resided in the same town within a mile of each other; that in the early part of May the testator's cow was straying upon the road; that on the 17th of May he found her in his door-yard, and it was there he "took her up;" that he first drove her out into the road, and then into his barnyard; that he put and kept her in his stable night and day, separate from his own cows, which were in the barnyard in open view; that he kept her there until the 27th of May, when she was taken from the stall without his knowledge; that the door was unlocked, though probably fastened with a pin; that he had no positive evidence who took her from the stable; that he did not look for her, and that he did not know where she was at the time of the trial.

It also appears that on the day of the seizure, immediately after putting the cow in the stable, he notified Mr. Harris, one of the commissioners of highways, and procured from him six notices, of which the following is a copy, which the defendant posted in six public places, as required by the act of 1862:

"NOTICE.—Taken up by Wm. B. Nearing, one deep-red cow about ten years old, blind in the left eye, which I shall expose at public sale on the premises of the said Nearing, the third day of June, at one o'clock P. M., unless redeemed previous to the day of sale. Dated New Lisbon, May 17, 1864.
                              "A. HARRIS, Commissioner."

It was proved that on the day named for the sale, a demand of the cow was made in behalf of the testator, which was not complied with by the defendant, no reasons being assigned for the refusal.

When the time for sale arrived, the defendant and the commissioner were there, but the cow was not present. A protest was made in behalf of the testator against such sale; and Mr. Harris said the cow had been stolen or strayed, but he would sell her. He read no notice of sale, but referred for a description of the animal to the notices previously posted

by the defendant. Thirty or forty persons were present. There were but two bidders, of whom the defendant was the highest; and he purchased the cow for one dollar and eighty-eight cents. It was admitted on the trial that she was worth twenty-five dollars.

There was no proof of any notice to the testator of the seizure of his cow by the defendant; but the latter offered to testify that he had previously notified the testator that his cow had been on his premises and requested him to take care of her. The proof was rejected as immaterial. The case is reported in the Supreme Court in 44 Barb., 472.

*E. Countryman*, for the appellants.

*L. L. Bundy*, for the respondent.

PORTER, J. The defendant claims to have acquired title in the plaintiff's cow, through his own act in seizing, selling and buying her, without judicial authority, and without the consent of the owner. She was in his door-yard; and there is no pretense of any warrant for her seizure, unless it can be justified under the provisions of the " act to prevent animals from running at large in the public highways." (Session Laws 1862, 844.)

The first section of that act declares that it shall not be lawful for any cattle, horses, sheep and swine to run at large in any public highway in this State.

The second section authorizes any person to take into his custody and possession: 1. Any animal which may be in *any public highway*, opposite to his land, against the provisions of the first section. 2. Any animal which may be *trespassing upon his lands*.

The third section requires, that immediate notice of the seizure be given to some justice or commissioner of highways of the town, who shall post notices that the animal will be sold at a time and place to be specified, and who shall make such sale for cash. From the proceeds, in a case like this, he is to retain half a dollar for his fees, and pay half a dollar to the captor, with a reasonable compensation in addition for

keeping the animal.   The surplus he is to pay to the owner, on demand and proof of title; whose claim is to be barred, unless made within one year, and the money, in that case, to be paid to the supervisor for the use of the town.

The fourth section authorizes the owner to reclaim possession of his property before sale, on making proof of title and paying the like sums to the captor and the officer, with an abatement of half the *bonus,* if paid three days or more before the day appointed for the sale.

The fifth section relieves him from the payment of any · bonus, and entitles him to restitution on payment of compensation for keeping the animal, if the running at large or trespassing was caused by the willful act of a person other than the owner in order to effect the seizure; but it provides for no mode of ascertaining or proving the fact.

The question whether the act is valid, so far as it relates to the seizure and sale of animals running at large in a public highway, is not involved in the present appeal.   That issue might well be controlled by considerations connected with the police powers of the government.   No such authority can be invoked in support of its provisions, so far as they relate to the seizure and confiscation of animals found on the premises of the captor, as a punishment for a private trespass.

The legislature transcends the limits of its authority, when it enacts that one citizen may take, hold and sell the property of another, without judicial process, and without notice to the owner, as a mere penalty for a supposed private injury. Such an enactment is within the terms and intent of the provision in the bill of rights, that no person shall be deprived of life, liberty or property, without due process of law. (Const., art. 1, § 6.)   The import of these words is familiar to every student of constitutional law.   It would scarcely be possible to find, in the records of our jurisprudence, a definition of this historic and memorable clause, in terms which do not carry with them a condemnation of the enactment under consideration.

" The words, ' due process of law,' in this place," said Chief Justice BRONSON, " cannot mean less than a prosecution or

suit, instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt, or determining the title to property. It will be seen that the same measure of protection against legislative encroachment is extended to life, liberty and property; and if the latter can be taken without a forensic trial and judgment, there is no security for the others. If the legislature can take the property of A., and transfer it to B., they can take A. himself, and either shut him in prison or put him to death." In another portion of the same opinion he observes: "It must be ascertained *judicially* that he has forfeited his privileges, or that some one else has a superior title to the property he possesses, before either of them can be taken from him. It cannot be done by mere legislation." (*Taylor* v. *Porter*, 4 Hill, 146, 147.)

This court had occasion, in the case of *Westervelt* v. *Gregg*, to define the language of this provision of the Constitution. "Due process of law undoubtedly means in the due course of legal proceedings, according to those rules and forms which have been established for the protection of private rights. Such an act as the legislature may, in the uncontrolled exercise of its power, think fit to pass, is in no sense the process of law designated by the Constitution." Judge DENIO, in the same case, said: "The provision was designed to protect the citizen against all mere acts of power, whether flowing from the legislative or executive branches of the government. It does not, of course, touch the right of the State to appropriate private property to public use upon making due compensation, which is fully recognized in another part of the Constitution; but no power in the State can legally confer upon one person or class of persons the property of another person or class, without their consent, whatever motives of policy may exist in favor of such transfer." (2 Kern., 209, 212.)

In the case of *Wynehamer* v. *The People*, all the judges concurred in their views, as to the import of this restriction in the bill of rights. Judge COMSTOCK, after citing the earlier authorities on this subject, proceeded to say: "It is plain, therefore, both upon principle and authority, that these constitutional safeguards, in all cases, require a judicial

investigation, not to be governed by a law specially created to take away and destroy existing rights, but confined to the question whether, under the *preëxisting* rule of conduct, the right in controversy has been lawfully acquired and is lawfully possessed." Judge Alex. S. Johnson, after citing this and the kindred clauses in the bill of rights, described by Chancellor Kent as "part of the muniments of freemen," added some observations of striking force, and peculiarly pertinent to the question now before us. "Many rights are plainly expressed, and intended to be fundamental and inviolable in all circumstances. A law enacting that a criminal should, as a punishment for his offense, forfeit the right of trial by jury, would contravene the Constitution, and a deprivation of this right could not be allowed in the form of a punishment. Any other right, thus secured as universal and inviolable, must equally prevail against the general power of the legislature to select and prescribe punishments. These rights are secured to all; to criminals as well as others; and a punishment consisting solely in the deprivation of such a right, would be an evident infringement of the Constitution." Judge Selden, in remarking upon the language of this provision, said: "It must be understood to mean that no person shall be deprived, by any form of governmental action, of either life, liberty or property, except as the consequence of some judicial proceeding, appropriately and legally conducted. It follows that a law which, by its own inherent force, extinguishes rights of property, or compels their extinction, without any legal process whatever, comes directly in conflict with the Constitution." In the same case Judge Thomas A. Johnson said, with equal directness and precision: "The constitutional provision referred to was intended to protect property from confiscation by legislative enactments, and from seizure, forfeiture and destruction, without a trial and conviction by the ordinary modes of judicial proceeding." (3 Kern., 395, 419, 434, 468.)

In view of the foregoing exposition by the courts of the design and effect of the constitutional restriction, the legislature has no authority either to deprive the citizen of his

property for other than public purposes, or to authorize its seizure, without process or warrant, by persons other than the owner, for the mere punishment of a private trespass. So far as the act in question relates to animals trespassing on the premises of the captor, the proceedings it authorizes have not even the mocking semblance of due process of law. The seizure may be privately made; the party making it is permitted to conceal the property on his own premises; he is protected, though the trespass was due to his own connivance or neglect; he is permitted to take what does not belong to him without notice to the owner, though that owner is near and known; he is allowed to sell, through the intervention of an officer, and without even the form of judicial proceedings, an animal in which he has no interest, by way either of title, mortgage, pledge or lien; and all to the end that he may receive compensation for detaining it without the consent of the owner, and a fee of fifty cents for his services as an informer. He levies without process, condemns without proof, and sells without execution.

It was affirmed in the court below that such a proceeding in the case of a private trespass was authorized by preëxisting laws, and that the act in question is, therefore, not within the condemnation of the Constitution. This view would be entirely correct if such had been the state of the law antecedent to the adoption of the bill of rights.

There are many examples of summary proceedings which were recognized as due process of law at the date of the Constitution, and to these the prohibition has no application; but none of them furnish any sanction to the enactment now under consideration. The process of distraining cattle *damage-feasant* is referred to, as an authority for the provisions embodied in this law; but it will be found, on examination, that the supposed analogy is unfounded and illusory. It is evident that the distinction between penal and remedial proceedings was overlooked in the court below, as applicable to cases of mere private trespass.

The right to distrain property *damage-feasant* was one which existed at common law; and it was recognized and

regulated by statute, as well in this State as in England. The proceeding was always purely remedial. The party distraining was authorized to detain the property in pledge for the payment of his damages. By seizing it at the time and on the premises where the injury was committed, he was enabled to secure redress for an actual wrong against an unknown or irresponsible owner. If the animal escaped from his premises, though he was in fresh pursuit, his right of distress was gone. The party making the seizure was required to have the damages promptly appraised by the fence-viewers, upon a view of the premises and the examination of competent witnesses. They were bound to certify the amount of damages to which he was entitled, and he was required, within twenty-four hours thereafter, to put them in the nearest pound; where the owner could find and replevy them, or reclaim them on payment of his damages and the fees of the fence-viewers and pound-master. The party distraining was bound to give notice to the owner, if known, to enable him to replevy or redeem the property before the sale. The remedy by distress was cumulative, and satisfaction obtained in this mode was a bar to an action for damages. (3 Wooddeson, 226; 3 Bac. Abr., title, Distress, F; 3 Black. Com., 6; 2 Wait's Law and Pr., 778; 2 R. S., 517; *Colden* v. *Eldred,* 15 Johns., 789.)

The law applicable to strays is also invoked as an authority for summary confiscation, as a punishment for a private trespass. It will be found on examination that the proceedings in that class of cases are remedial in their ·nature, in respect to the party instituting them, as well as the owner of the property. The duties of each are defined, and the rights of each are secured by specific and appropriate safeguards. A specific description of the property, with the name and residence of the party, is required to be entered in the office of the town clerk. Ample provision is made to give time and opportunity to the owner to reclaim the property, and the compensation to be paid, if the parties disagree, is to be determined by award of the fence-viewers; and it is only in case of a failure of reimbursement by the

owner, for a service lawfully performed for his benefit, that a sale of the property is permitted. (2 R. S., 351.)

It follows from these views that the seizure and sale of the defendant's property was unlawful, and that the judgment of the court below should be reversed. We should have no difficulty in arriving at the same result if we were at liberty to assume the validity of the act of 1862, in respect to private trespasses. The party who resorts to a severe and summary remedy, unknown to the common law, is held to the duty of strict compliance with the statute. Even in the case of a distress authorized by the common law, any subsequent abuse of the power conferred renders the party liable as a trespasser *ab initio*. (*The Six Carpenters' Case*, 8 Coke, 290; *Sackrider* v. *McDonald*, 10 Johns., 253; *Dumont* v. *Smith*, 4 Denio, 320.). The defendant knew that the property he seized belonged to the plaintiff, who resided within a mile of him in the same town. Ordinary good faith required him to notify the owner that the lost cow was in his stable; and though the act of 1862 is silent in respect to such notice, it may well be questioned under the authorities whether the obligation to give it is not implied in a case where the owner is known. (*Commissioners of Highways of Kinderhook* v. *Claw*, 15 Johns., 537; *Peters* v. *Newkirk*, 6 Cow., 103; *Elmendorf* v. *Harris*, 23 Wend., 632, 633; *Doubleday* v. *Newton*, 9 How., 71.) But the defendant, by his subsequent acts, rendered himself clearly liable as a trespasser from the beginning. He procured a sale of the property by the commissioner at public auction, against the protest of the plaintiff, when the animal was not present, and without any description to the bidders of the cow they were invited to buy. Under these circumstances he was enabled to become the purchaser at a merely nominal price. The act was plainly illegal. It was a palpable abuse of authority, even if the law had been valid; and it operated by relation to render the original seizure unlawful. (*Sheldon* v. *Loper*, 15 Johns., 352; *Cresson* v. *Stout*, 17 id., 116; *Hopkins* v. *Hopkins*, 10 id., 369; *Connah* v. *Hale*, 23 Wend., 462, 470.)

The judgment of the Supreme Court and the County Court should be reversed, and that of the justice should be affirmed, with costs.

MORGAN, J.    The defendant attempted to justify the taking of the cow of the deceased under the provisions of the act of the legislature, entitled, " An act to prevent animals from running at large in the public highways." (Ch. 459, Laws of 1862, p. 844.)  His answer states substantially that on or about the 17th day of May, 1864, the defendant took the cow in his custody and possession which was then running at large in the public highway opposite to land owned and occupied by him, contrary to the provisions of the said act ; and that before the time advertised by the commissioner of highways for the sale, the cow was taken from his possession without his knowledge, in the night time, by some person unknown to him and without his assent or connivance, and that after diligent search he was unable to find her or to ascertain who took her away.

Upon the trial the defendant testified that the cow was in his door-yard when he took her up, and that she had been running in the highway opposite his land twice that day ; that he first drove her into the highway and then into his barn-yard.   She was afterward kept in his stable, and taken away the 27th day of May.   She was advertised to be sold on his premises on the 3d day of June, at which time the commissioner sold her at public auction to the plaintiff for one dollar and eighty-eight cents, the cow not being present at the time.

On the trial the defendant claimed that she was stolen from him on the 27th of May.   He testified that he left her in the stanchions that night, but he could not state that the door was fastened.   She was taken without his knowledge. He saw her tracks in the mud where she went out into the street.   It does not appear in evidence that he followed her up, or made any efforts to find her.   He could not state whether she was fastened up that night or not, although his son, who put her up, thought he fastened her up tight.

The plaintiff recovered of the defendant the value of the cow before the justice. Upon appeal to the County Court, the judgment was reversed, upon the ground that the proof was satisfactory to show a justification for the taking, and that, while lawfully in the defendant's possession, she was stolen.

One of the questions raised before the justice, and discussed in the County Court as well as in the Supreme Court, related to the constitutionality of the act of 1862 ; and its validity was affirmed in both courts. It is, doubtless, on account of such a question, that the case has been certified to this court.

But, if the cow was not *unlawfully* in the highway when she was seized by the defendant, under the authority of the act of 1862, the defendant has not brought himself within the protection of the act, so far as it authorizes a seizure of cattle running at large on the public highways. This act, if constitutional, is in derogation of the rights of persons, as recognized by the common law, and must be strictly followed in all its minutest requirements. Thus, under the law of distress, to which the law of 1862 has some resemblance, it was held, at a very early day, that if a man, coming to distrain *damage-feasant*, sees the beasts on his soil, and the owner purposely chases them out before they are taken, he cannot distrain them. (2 Bac. Abr., title, "Distress," letter F.)

The first section of the act of 1862 makes it unlawful for cattle to run at large on the public highway. This, doubtless, must be interpreted to mean that it is unlawful for the owner to allow his cattle to be at large on the public roads. It was not the intention to punish the cattle, but the owner. The second section begins by authorizing the owner of the land to seize cattle "*which may be in any public highway opposite to his land,* contrary to the provisions of the first section."

As the cow in question was not, at the time of the seizure, on the highway, but in the defendant's door-yard, he could not seize her under the foregoing authority. To use the liberal language of the first section, the cow was not committing an offense upon the highway when she was seized by the

defendant, but a private damage to the defendant, so that, doubtless, he might have taken her *damage-feasant*, and kept her until his damages were apprised, under the provisions of the Revised Statutes.

Now, it nowhere appears that the owner permitted his cattle to run at large upon the public highways, contrary to the provisions of the first section. As the cow was not guilty of the offense, but the owner, it should appear, I think, that he suffered her to run at large, or was in some way remiss in not keeping her upon his own premises. It may often happen, without fault of the owner, that his cattle go upon the public road. If they are there without the owner's fault, he cannot be deemed guilty of the offense mentioned in the first section of the act. His fences may be down without his knowledge — may be broken down by the wind or taken down by strangers — and his cattle may temporarily stray out upon the public highway. Does the statute intend to punish this as an offense? I think not; for it ought to have a reasonable construction, so as to embrace only those cases where the owner is himself guilty of some fault or negligence. This being a penal statute, can the court assume, without proof, that an offense has been committed by the plaintiff merely from the circumstance that his cow is found in the highway? I think there should be some proof, at least, besides the mere fact that cattle are found in the highway, to justify a seizure. And, without doubt, whoever seizes cattle upon the highway under the act of 1862, without being able to show that they are there by the permission or negligence of the owner, seizes them without right. There may be some question whether the burden of proof is not cast upon the owner of the cattle to show that he is without fault in such a case.

The act, however, provides no tribunal before which this question of *right* can be determined, and, in this respect, its constitutionality has been questioned.

If, however, the act is to be considered with reference to other statutes, it is not subject to this objection. The owner may have an action of trespass, trover or replevin; and, in

the latter action, he is provided with a remedy entirely suitable to the exigencies of the case, and in conformity to the long-established rules of the common law in cases of distress. Our statutes provide that, whenever any goods or chattels shall have been wrongfully distrained or otherwise wrongfully taken, or wrongfully detained, an action of replevin may be brought for the recovery thereof, or for the recovery of damages. (2 R. S. at Large, 540, § 1.)

It is also said that the owner of the cattle may not get notice, and that the act of 1862 is invalid, because it does not provide for giving the owner notice of the seizure and sale. The notice, however, is as public as it could well be made, and there is really no danger that it will not come to the knowledge of the owner in time to give him an opportunity to replevy his cattle or retake them before sale, on proof of ownership and payment of the statutory fees and compensation. It is substantially the same notice provided in case of *Strays* (1 Statutes at Large, 324, §§ 24, 25), and by the act of 1849, chap. 226, to enforce the responsibility of stockholders in banking corporations and associations. Judge Denio observes, in relation to the provisions of the act, authorizing notice by advertisement to stockholders: " It may be admitted that a statute which authorized any debt or damages to be adjudged against a person upon purely an *ex parte* proceeding, without pretense of notice or any provision for defending, would be a violation of the Constitution, and void ; but, when the legislature has provided a kind of notice by which it is reasonably probable that the party proceeded against will be apprised of what is going on against him, and an opportunity is afforded him to defend, I am of the opinion the courts have not the power to pronounce the proceedings illegal." (*In the matter of the Empire City Bank*, 18 N. Y., 200.)

If, therefore, the statutes of this State give to the owner of cattle, seized under the authority of the act of 1862 for unlawfully running at large upon the public highways of this State, an action of replevin, as in case of an illegal distress, by which the right of seizure may be tried according to the forms of law, and if the notice provided by the act is reasonably cer-

tain to give the owner of the cattle knowledge of the seizure, I do not think we can pronounce the act unconstitutional upon either of the above objections.

Another question arises, *as to the power of the legislature* to authorize the seizure of cattle for unlawfully running at large upon the public highways. The property of the individual, in such a case, is not taken, in the strict sense of the term, for *public use.* If it was, the law would allow to the owner a just compensation. It is not, therefore, taken by right of *eminent domain.* It may properly be called the *police power* of the legislature, which they are authorized to exercise for the public benefit. This power, as was said by SHAW, Ch. J., in *Commonwealth* v. *Alger* (7 Cush., 53), is "vested in the legislature by the Constitution, to make, ordain and establish all manner of wholesome statutes, ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same." (See Sedg. on Statutory and Constitutional Law, 505, &c.)

The legislature of this State has been in the constant practice of regulating the manner in which the highways of this State shall be made, altered, improved and protected. They are used by all our citizens to pass and repass at their pleasure, and any obstructions to this common right may be dealt with and denounced by the legislature. Upon the ground, therefore, that it is an injury to the *public* for cattle to be running at large upon the highways of the State, the legislature may punish the owner for permitting it. The effect of the act of 1862 is to subject the owner of cattle, who allows them to run at large upon the public highways, to the payment of a fine and to the forfeiture of his property, if he neglects to redeem it in the mode pointed out by the act.

Thus far, I see no ground upon which the act of 1862 can be pronounced unconstitutional.

But, as I have already observed, the defendant did not seize the cow while she was in the highway, contrary to the provisions of section 1 of the said act, but while she was trespassing upon his own premises.

He could not drive her into the highway and then seize her because she had been running on the highway previous to that time, for that would be contrary to the terms of the act.

I am of the opinion, therefore, that the defendant did not justify the seizure upon the ground assumed in his answer, viz. : that the cow was "then *running at large in the high-way opposite to land owned and occupied by him.*"

It may, however, be claimed, that, notwithstanding the defendant's answer, he made out a case under the last clause of section two of the act in question. It may be said that if the cow was not at the time upon the highway, she was trespassing upon his own lands contrary to the provisions of section two, the last clause of which is as follows : "And it shall be lawful for any person to take into his possession or custody any animal which may be trespassing upon prem-ises owned or occupied by him."

It is very apparent that this clause of section two is not germain to the subject matter, and may be rejected without doing violence to the general policy of the act in question. From its position, I think it must have been interpolated, without reflection ; for the title of the act relates to quite a different subject, and one clearly within the general authority of the legislature.

It has been said by the judges, in several cases, that the legislative power is not omnipotent. There have been several reported in this State, in which it has been said that the legis-lature cannot take the property of A. and give it to B. except in the exercise of some acknowledged delegation of power.

We have seen that the property of the deceased was not taken by right of *eminent* domain ; nor was it taken under the *police* power ; or as a security or pledge to satisfy any debt or demand of the defendant, by way of damages on account of the trespass. Notwithstanding the seizure and sale of the property under the act of 1862, the deceased was still liable to an action for the damages. In this respect it differs essentially from the remedy by distress, in which the distrainer seizes the cattle trespassing upon his premises and

holds them as a pledge to satisfy his damages. When impounded, the goods were formerly only in the nature of a pledge or security to compel the performance of satisfaction; and at the common law, they must remain impounded till the owner makes satisfaction or contests the right of distraining by replevying the chattels. (Blackstone Com., 4th book, p. 14.) At common law, if the owner remained obstinate, it was no remedy at all; but a statute authorizing the sale of the pledge, which (says the same author) is in the nature of an execution, effectuated and completed the remedy.

. The supposed analogy between the remedy by distress and the seizure of cattle under the law of 1862, while in the act of committing a private trespass, entirely fails.

The seizure of cattle, under the last clause of section 2 of the act of 1862, is no remedy at all, but simply an annoyance to the owner. It is not a case of *public* concern, if my cattle get into my neighbor's inclosure; and it cannot be punished as such by fines and penalties, and forfeiture of property.

As a necessary result of the constitutional provision, prohibiting the taking of private property *without due process of law*, the legislature cannot authorize the seizure of any man's property, except for some legitimate object, or in the exercise of some power confessedly within the range of legislation.

To return to the last clause of the second section of the act of 1862: What was the design of the legislature, in authorizing the plaintiff to seize and sell his neighbor's cattle, because they were trespassing on his land? It was not to protect the public highways. It was not to provide any remedy for the damages; it was not to devote them to the public use. Then, what was the object, except to punish a man for committing a private wrong, in which the public had no interest whatever, except as spectators?

Without going at further length into the cases which may be cited in support of the proposition, I am of the opinion that the last clause of the second section of the act of 1862 is in violation of the Constitution of this State, which denies

to the legislature authority to deprive a man of his property without *due process of law.*

By reference to that clause in section two of the act in question, it will be seen that it has no necessary connection with the public highways. The cattle may be trespassing upon another's premises without going upon the public highway at all; and the authority given to the owner of the premises to seize and sell them under the provision of the subsequent sections, is not for any object connected with the administration of the laws, either for private redress or public purposes. The seizure and sale, authorized by that clause, neither benefits the owner of the land nor corrects a public wrong.

Unless, therefore, the act in question authorizes the seizure of cattle, not unlawfully trespassing, *at the time* of seizure, upon the public highways, contrary to the provisions of the first section, the defendant's justification entirely fails. They must be taken *while they are running at large* in the highway or not at all, if I am right in holding that they cannot be taken under the last clause of section 2; for without that clause there would be no pretense of justification for the seizure in this case.

In my opinion, there is great difficulty growing out of another branch of the case. If the seizure of the cow by the defendant had been lawful in the first instance, he was responsible for losing her out of his possession, unless he was able to show that it occurred without his fault. It may, perhaps, be assumed that, in point of law, the defendant would not be liable for a larceny of the cow. But does the evidence show, beyond a doubt, that she was stolen? It does not appear whether the judgment of the justice was predicated upon the unconstitutionality of the law of 1862, or upon the hypothesis that the defendant failed to show, to his satisfaction, that the cow was stolen. The answer of the defendant claims that he made diligent efforts to find her, but he offered no evidence to maintain this part of his answer.

It may be said, upon the evidence, that there was no larceny of the cow proved against anybody; nor can it be

assumed, I think, that the defendant could not have recovered her if he had used proper efforts to do so — such efforts as a man would use to recover his own property.

I confess I am not satisfied that the cow was stolen; nor do I believe that the defendant was entitled to the benefit of such a defense without furnishing further proof upon that point.    He should have followed up her tracks, and should have made diligent efforts to recover her, such as the owner himself would ordinarily make to recover his own property. In my opinion, he was guilty of laches in not following up the loss by suitable efforts to recover the property.

But, independently of this question, I think the judgment of the Supreme Court, as well as that of the County Court, should be reversed, with costs in both courts, and that of the justice affirmed.

All the judges concurring,

Judgment accordingly.