PEOPLE *ex rel.* TOWN OF ROCHESTER *et al.* v. DEYOE, Clerk of Ulster County.

*Railroad aid bonds — tax payer withdrawing. consent given — Laws of 1866, chapter 794 — powers of county clerk judicial — constitutionality of acts to bond towns — certificate of consent of tax paying corporation — identity of names.*

Certain tax payers of a town, constituting a majority in number and amount of those whose names appeared upon the last preceding assessment roll, filed with the county clerk their consents to the issue of the bonds of the town in aid of a railroad, under Laws of 1866, chapters 398 and 695, as amended by Laws of 1870, chapter 794, section 4. Afterward, and before the clerk made the affidavit required by the statutes, enough of those consenting to reduce the number below a majority filed their revocation of such consents, and certain other tax payers appeared before the clerk and insisted upon his taking such revocations into consideration, and made certain offers of proof, and certain legal objections. The clerk, however, made his affidavit, holding that he could not take any other proof than the consents.

*Held,* upon *certiorari,* reviewing the proceedings, that the power given to the clerk by the statutes in question, was judicial, and that he should have considered the revocations and received the proof.

*Held, also,* that if the power was not judicial then the statutes conferring it were obnoxious to the provision of the constitution prohibiting the taking of private property without due process of law, and void.

The assessment roll contained the name "President, managers and company of the D. and H. C. Company." One of the consents filed was signed " the D. and H. C. Company, by Geo. Tallbot Olyphant, prest. *p. t.,*" attested by a seal and witnessed by " Charles P. Hartt, treasurer." It was acknowledged by Hartt, who, after being described as treasurer of " the aforesaid corporation known and described as the president, managers and company of the D. and H. C. Company," deposed to his residence, "and that he is treasurer of said corporation ; that he was personally present at the execution of the above written indenture, and saw the common and corporate seal of the said president, etc., duly affixed thereto, and the seal so affixed thereto is the common and corporate seal of the said, the president, etc., and that the above indenture was duly sealed and delivered by, and as and for the act and deed of the said, the president, etc., for the uses and purposes therein mentioned : that the name of this deponent, subscribed to the said deed as treasurer of the said corporation, in attestation of the due execution and delivery of said deed, is of this deponent's own, proper and respective handwriting; and that the name of George Tallbot Olyphant, president, *p. t.,* of said corporation, also subscribed to the said deed in attestation of the due execution and delivery thereof, was so subscribed in this deponent's presence, and is of the said George Tallbot Olyphant's own, proper and respective handwriting." *Held,* insufficient, because,

People ex rel. Town of Rochester v. Deyoe.

1. It was not sufficiently shown that either "the president, managers and company of the D. and H. C. Company," or "the D. and H. C. Company" is a corporation.
2. It was not shown that the corporation possessed the power to execute such a consent.
3. Authority to affix the corporate seal was not shown.
4. Authority for the execution of the consent was not shown to have been given by the governing body of the corporation.
5. There was not sufficient evidence that "George Tallbot Olyphant" was the president, nor that the president *pro tem.* had power to execute such an instrument.

A consent by a person whose name differs from a nearly corresponding name upon the assessment roll, though the difference be slight, will be insufficient, unless there is evidence to show that the names represent the same person.

CERTIORARI to review the proceedings of the county clerk of Ulster county, upon an affidavit made by him, and filed in the office of said clerk, under the provisions of various statutes; the first of which is entitled "An act to facilitate the construction of the New York and Oswego Midland Railroad, and to authorize towns to subscribe to the capital stock thereof, passed April 5th, 1866 (chap. 398), and of the several acts amendatory thereto, to carry into effect the purposes and provisions of the said acts. Under the provisions of the amended act of 1870, chap 794, § 4, certain parties being desirous that there should be a branch of this railroad, to be extended from Ellenville, Ulster county, to the Hudson river, commenced proceedings to obtain the consent of a majority of the taxable inhabitants representing a majority of the taxable property of the town of Rochester in said county to that end; and assuming that they had succeeded in obtaining the proper consents, proved and acknowledged in the manner provided by said act, they did, on the 25th day of March, 1872, present the said evidence to the clerk of the county of Ulster, in order to procure the affidavit of the said clerk, proving the fact that a majority of the said tax payers, representing a majority of the taxable property, had been duly obtained, according to the provisions of said act.

Before the clerk made his affidavit, according to the requirements of the said act, forty-six of the persons whose names were subscribed to such consents presented to and filed with the said clerk a paper declaring their withdrawal of said consents, and that they thereby canceled and annulled their consents theretofore given, and giving notice of their opposition to creating any liability upon the town

for the construction of the said railroad. The signature to these withdrawals was duly verified.

Certain other parties, tax payers of the town, appeared before the clerk, before said affidavit was made by him, and made and filed certain legal objections, and offered to make proof before him of the statements so made, as follows :

" We object to the clerk making the affidavit, or giving the certificate asked for,

" 1st. Because the act is unconstitutional.

" 2d. The general bonding act repeals the special act under which the town of Rochester is sought to be bonded, and this proceeding should be before the county judge.

" 3d. If the clerk entertains the case, we ask for an opportunity to prove that the requisite consents have not been obtained, and that many signatures (enough to reduce the consents below the amount required to bond) were obtained by false representations as to the contents of the papers they signed, and many were obtained by fraud and bribery.; and that the papers submitted furnish no proof that the requisite consents have been obtained.

" That the majority in number of taxable names, and amount of taxable property, has not been obtained.

" That a large number of the tax payers appearing on the last assessment roll of the town of Rochester, who have signed the consent to bond the said town in aid of the New York and Oswego Midland Railroad Company, have withdrawn their consents and given notice of such fact to the clerk of Ulster county, and which names form part of the number now appearing before the clerk to make the majority in number and amount of tax payers and taxable property appearing on the last assessment roll of said town.

" That many persons whose names appear to the petition never signed them nor authorized the same.

" P. CANTINE,<br>
" Of Counsel for Opponents.

" ULSTER COUNTY, ss. :

" Lucas Krom, Jr., John D. Winfield, Tunis H. Duryea and Jacob M. Osterhoudt, of the town of Rochester, in said county, being sworn, say, and each says, that he is a freeholder and tax payer of said town, and makes this affidavit to oppose the application now pending before the county clerk; that John D. Winfield

People ex rel. Town of Rochester v. Deyoe.

is supervisor of the town of Rochester, and have authorized the above objection.

"LUCAS KROM, Jr.,

"J. D. WINFIELD,

"TUNIS H. DURYEA,

"JACOB M. OSTERHOUDT.

"Sworn before me, }
  March 24, 1872. }

"J. M. VAN WAGONEN, *Notary Public.*"

After the filing of these offers, and the objection to the making of the affidavit by the clerk, he returns to the *certiorari* and certifies to this count: "That I declined and refused to take or allow proof to be given under or in support of said objections, for the reason that I considered and held I could not go back of the affidavits and acknowledgments appearing upon or annexed to the consents taken before officers, the signatures of which officers I knew to be genuine, and that I had no power to take proof other than was submitted to me written upon or annexed to said consents."

The other facts material to the case will appear in the opinion.

*P. Cantine* and *T. R. Westbrook*, for relators.

*John Lyon*, for respondent.

P. POTTER, J.   The right, or rather the authority, to issue bonds in order to create a liability upon the town of Rochester and upon the tax payers thereof, in aid of the railroad in question, was conditioned upon first obtaining the consent, in writing, of a majority of the tax payers of such town owning or representing (as agent, president or otherwise, including owners of non-resident lands) more than one-half of the taxable property assessed, and appearing upon the assessment roll of the year preceding the date of acknowledging or proving the consents given or obtained. Laws 1866, chap. 298, § 2; Laws 1871, chap. 298, § 2.

These consents are required to be proved and acknowledged in the same manner as conveyances of real estate are proved and acknowledged;   *   *   they shall state the amount of money authorized to be raised, etc.   And the fact that a majority of the said tax payers, representing a majority of the taxable property, has been

146 THIRD DEPARTMENT,

People ex rel. Town of Rochester v. Deyoe.

obtained and acknowledged or proved, shall be proved by the affidavit in writing of one of the assessors of the town (or city), or by the affidavit of the town or county clerk, and shall be indorsed upon or annexed to said written consent ; and the said consent and affidavit shall be filed in the town clerk's office of the town, and a copy thereof in the county clerk's office of the county, * * and the same, or a certified copy thereof, shall be evidence of the fact therein contained, and shall be admitted in evidence in any court of this State, and of any judge or justice thereof, and it shall be the duty of the said assessors and town and county clerks to make such affidavit when said consent shall have been obtained, as in said section provided. Laws 1866, chap. 398, § 2. By an amendment to this act in the same year, 1865 (chap. 695), the original written consent of the tax payers, proved and acknowledged as aforesaid, are required to be *recorded* and filed in the office of the clerk of the county, and a copy, duly certified, to be filed in the town clerk's office. Under this amendment the county clerk alone made the affidavit.

The first question raised by the defendants in answer to this writ now is, that upon *certiorari* none but acts of a *judicial* nature can be reviewed, and that the proceedings before the county clerk were not judicial — that the making of the affidavit of the clerk was not a judicial act. The clerk in this case had a duty to perform, as a specially constituted tribunal, by statute. He was clothed by this statute with authority, and was thereby called upon to exercise his judgment and discretion upon the examination of evidence; and, therefore, to determine whether the preliminary acts of the petitioners, required by statute, had been taken; which created the power to bond the town. When he had thus exercised his judgment, and formed an opinion, the making of the affidavit was but the record, expression, or evidence of that judgment and discretion. The exercise of his judgment upon the question whether a majority of the tax payers had given their consent according to law to bond the town, was, I think, in its nature judicial. See *Pierce* v. *Wright*, 45 How. 7; *Howland* v. *Eldridge*, 43 N. Y. 460, 461.

It is now well settled that the office of the writ of *certiorari* is to call up for review the proceedings and determinations of inferior tribunals, and it gives authority to review all questions of jurisdiction, power and authority of the inferior tribunal to do the act or acts complained of, to examine the evidence, and to

examine whether there was competent proof of the facts necessary to authorize the adjudication made, and whether, in making it, any rule of law affecting the rights of the parties had been violated (*People* v. *Smith*, 45 N. Y. 777), and all questions of regularity in the proceedings to be reviewed — whether the inferior tribunal has kept itself within the boundaries prescribed for it by the statute, or by the principles of the common law. *People* v. *Wilbur*, 57 Barb. 600; *People* v. *Board of Assessors*, 39 N. Y. 81; 40 id. 154.

The affidavit of the county clerk shows no other knowledge, in himself, of the number of tax payers, and the amount of taxable property in said town of Rochester, than that which he has derived from the assessment roll of said town for the year 1871, and such as is obtained from the said consents so given to the said borrowing of money on the faith and credit of said town. All which consents, affidavits and city assessment roll are returned with the writ, and are before us for review. The objections now raised are those which appear on the face of said papers, as well as also the papers withdrawing consent, and the objections filed with the county clerk and insisted on before the making of his said affidavit.

The results obtained from the affidavit of the county clerk are, according to his finding, that the whole amount of taxable property of the town of Rochester in the year 1871, appearing on the assessment roll, is.................................... $687,710 00

The amount represented by the persons consenting, is $395,000 00
One-half of the taxable property is................. 343,855 00

Majority of property consenting............... $51,145 00

The whole number of tax payers appearing on the assessment
roll for 1871, is........................................ 740

The number who have signed consents is .................. 395
One-half of 740 tax payers is............................. 370

Majority of tax payers giving consent is................ 25

The *power* of the legislature to pass an act to aid in the construction of such local public improvements as railroads is, it would seem, no longer a question to be discussed in the courts. The creat-

ing of liability to the amount of $100,000 upon the private property of the tax payers of this town, to aid in the construction of a railroad, it may well be supposed, is greatly obnoxious to a large proportion of the tax payers, and is calculated to provoke such a watchful jealousy by the parties opposed, as to demand that the preliminary steps shall be in strict compliance with constitutional power, followed by a performance of all the precedent conditions prescribed by the statute. It is seen by the statute in question that a way is provided by which individual property of the citizen may be taken from him by first creating a liability thereon, even against the consent of the owner, through the instrumentality of written consents of a majority of the tax payers thereto, and proof that the consents of a majority of such tax payers have been filed and recorded with the county clerk. This proof of filing and recording is now to be made by the county clerk. If this act of the clerk is not judicial, the statute provides none. The constitution of this State (art. 1, § 6) declares that no person shall be deprived of life, liberty or *property, without due process of law.* Is the taking of property in the manner provided in this statute, " *due process of law ?* " It was said in the court of appeals, per COMSTOCK, J., in *Wynehamer* v. *People,* 13 N. Y. 395 : " It is plain, both upon principle and authority, that these constitutional safeguards, in all cases, require *a judicial investigation* — not to be governed by a law specially enacted to take away and destroy existing rights, but confined to the question, whether, under the pre-existing rule of conduct, *the right in controversy has been lawfully acquired,"* etc.

JOHNSON, J., in the same case, said (p. 418) : " Without *judicial* investigation, without due process of law, no act of legislation can deprive a man of his property," and that, in civil cases, " an act of the legislature alone is wholly inoperative to take from a man his property." In *Taylor* v. *Porter,* 4 Hill, 140, BRONSON, J., in referring to this constitutional provision, said : " The meaning of this section seems to be, that no member of the State shall be disfranchised or deprived of any of his rights or privileges, unless the matter shall be *adjudged* against him, upon a trial had according to the course of the common law. It must be ascertained judicially," etc.   *   *   * " It cannot be done by mere legislation." So, too, in *Embury* v. *Conner,* 3 N. Y. 511, it was held, that a statute which authorizes the transfer of one man's property to another, without the consent of the owner, is unconstitutional and void, although compensation is

made. In reference to this same constitutional provision, it was said in *Westervelt* v. *Gregg*, 12 N. Y. 209: "Such an act as the legislature may, in the uncontrolled exercise of its power think fit to pass, is, in no sense, *the process of law* designated by the constitution." In *Wynchamer* v. *People*, SELDEN, J., said, in reference to this provision of the constitution: "It must be understood to mean that no person shall be deprived, by any form of governmental action, of either life, liberty or property, except as the consequence of some *judicial proceeding* appropriately and legally conducted."

An act of the legislature of 1862, which authorized the seizure and sale of animals trespassing on private inclosures, or running at large, without judicial process or trial, was held to be a violation of this same provision of the constitution. *Rockwell* v. *Nearing*, 35 N. Y. 302. These authorities are referred to, because the question has been distinctly raised on the argument, that this liability has been created by an act of the legislature, without providing any *judicial* forum, in which the legality of the proceeding may be questioned by the parties interested. It is insisted on the part of the defendant, which I think was an argument against themselves, that the county clerk was invested with no judicial authority; that his duty in making the affidavit of the existence of certain facts was merely ministerial, made so by statute. On the part of the relator it is claimed that the duty of the clerk was judicial, but if not judicial, that then the act was unconstitutional, for the reason that it provided no judicial forum or body between the legislature and the citizen. The statute is silent as to the powers conferred upon the clerk beyond those mentioned. Nothing is better established, under our form of government, than that the legislature cannot themselves exercise *judicial* powers. They may in certain cases, in this class of cases, declare who may exercise judicial powers, they may confer it upon the county judge, or upon the county clerk, and they may declare what shall be received as legal evidence, but where a statute requires proof of a fact, unless it declare the method of proof, the law requires legal proof. In this case it required only an affidavit. But the making of this affidavit was the final and only determination of the question, whether the consent of a majority of the tax payers representing a majority of the taxable property had been obtained. The clerk is the only officer to whom the writ of *certiorari* will lie. I apprehend it was not the *duty* of the county clerk to swear to consents *if they did not* comply with

every one of the conditions of the statute. If they did so comply, they were then to be *evidence to the clerk*, but only evidence, not conclusive if the clerk was acting judicially; it was then his duty to pass upon the sufficiency or insufficiency of the evidence and of the impeaching or impairing evidence. If these consents were obtained by fraud, by misrepresentation or bribery, then they were not legal consents. If. these consents were given conditionally, there ought to be the right to show that the consent was not absolute, and a power to decide upon that right. If these consents are revocable before final action upon them, the revocation ought to be permitted to be shown. That they are revocable has been held in the court of appeals. If none of these things can be shown under the statute in question, if the clerk is a mere ministerial officer, with power only to verify the acts of the party favoring the creation of a debt, without power or authority to recognize or to act upon the evidence of the party opposing its creation, then the legislature must be held to have assumed the exercise of judicial power themselves, or to have delegated to one portion of the taxable inhabitants of a town the power to impose a debt upon the other portion, against their will and without ability to invoke the protection of judicial power in their behalf. Such a construction is inconsistent with constitutional protection, inconsistent with our system of jurisprudence, and inconsistent with the provision in the same act in regard to the consents to be obtained in the *city* of Oswego, where the consents are required first to be obtained by ballot at an election to be held, at which the assent of two-thirds of the voters are required to be had, the election to be held for three successive days; and, after canvass by the proper officers, and a return of the votes to the city clerk, the common council shall then proceed to *determine* whether two-thirds of such votes have been cast for such bonding; and, to make such *determination* final, it is required " to be signed by all the members present, and entered in their minutes." Here is judicial action required for the *city ;* it would seem to be equally required for the towns. The act itself does not expressly direct or define the duty of the clerk or how he shall proceed in *determining* the fact whether or not the consent of a majority of the tax payers, representing a majority of the taxable property, has been obtained. If, however, judicial power is conferred upon him by the act, it follows that the authority to act carries with it, by

People ex rel. Town of Rochester v. Deyoe.

necessary implication, the right to examine the evidence offered by the opposing party, and to satisfy his mind *judicially.*

But it is claimed that the constitutional question does not arise and cannot be called in question, as this is the creation of a debt under the *taxing power* which is an exception to the rule, inasmuch as the property is taken for public use. This, if done, would be an exception fairly to be taken, and would have some force if the case comes within the spirit of the law, of the right of taxation for strictly public purposes. This is well-settled law. This was recognized in the late case of *People* v. *Flagg,* 46 N. Y. 401, that the towns of the State possess such powers in relation to the imposition and collection of taxes as the legislature confers upon them. That was a case for the making and improving public highways, clearly and confessedly a public purpose, and that only; and though it was said in that case that the legislation even in that case was subject to severe criticism in imposing onerous burdens upon the people, against their consent, yet it was held that power for *such* purposes was not restricted by the constitution. But the learned chief justice remarked, "if the object of the expenditures was *private,* or if the money to be raised was directed to be paid to a *private corporation,* who were authorized to use the improvements for *private gain,* the question, in my judgment, would be quite different; *and in this respect* there is a limit beyond which legislative power cannot legitimately be exercised." This view of the chief justice has since had further expression in the same court in the case of *The People* v. *Bacheller,* 8 Alb. L. J. 120, which was a case of town bonding for a railroad. In this latter case GROVER, J., after referring to the case of *People* v. *Flagg,* and the distinction suggested by the chief justice, says: "It is manifest that the question presented in the present case *was not determined in that,* unless it shall be further held that a railroad owned and controlled by a corporation, and operated by it for the benefit of its stockholders, is a public highway in the *same sense* as the *common roads* of the country. The towns through which the latter run may be compelled to construct and keep them in repair for the common use of the public. The substantial question in the *present case* is, whether they may be so compelled to construct and keep them in repair for the common use of the public. The substantial question in the *present case* is, whether they may be so compelled to construct and repair *railroads,* owned and operated by corporations for the benefit of the stockholders.

The distinction between these two classes of roads is clearly taken and well distinguished in the two cases cited. *Common highways* are public for all purposes; the use is public, and taxation for making and keeping them in repair is entirely within legislative control. Railroads are partly public and partly private. They are for a public purpose, so far as the State grants them the right of eminent domain, to take and condemn real estate for public (not private) use, "but it is equally clear," says Judge GROVER, "that the property acquired by the corporation belongs to it exclusively; and its ownership is as absolute as that of any private individual of property belonging to him. It is also clear that, so far as the road is operated for the benefit of its stockholders, the corporation is *private*." While the learned judge then concedes the power of the legislature to compel towns to construct and maintain improvements of a public character *exclusively*, "yet," he says, "no one would claim that an individual could be compelled by a statute to exchange his note, or bond, or mortgage (and he might have added a pledge of his real estate), with a railroad corporation for its stock, against his will, upon such terms as may be presented by statute." A railroad corporation then, as we draw the rule from these cases, partakes of both characters, public and private — *public* as to its franchise, *private* as to its ownership of its property and its relations to its stockholders. The bonding of the town is for its private use. These are the most modern views of the court of highest authority in this State, and though they do not go to the extent of holding to the invalidity of laws for bonding towns; it is clearly to be seen that laws for this purpose are to be looked upon with great jealousy; that they do present questions of grave importance, inasmuch as upon their validity may depend the creation of a debt against a town to the extent of twenty per cent of all the taxable property of a town, against the will of a large proportion of its tax payers; the avails of which debt is for the *private* use of the stockholders of a corporation. It is sufficient for us in this case to hold that a statute conferring such power, so seriously affecting the natural rights and pecuniary interests of the citizens, should only be permitted to be carried into effect by the strictest conformity to the spirit and intent of the statute, and such statute should be held to be clearly within the constitutional limits. In the language of ALLEN, J., in *People* v. *Smith*, 45 N. Y. 781, "nothing can be taken by implication, and

the act, as it imposes a burden upon the public, and in a manner deprives the owner of a full control and disposition of his property, by giving to others the power to incumber it, should be strictly construed in favor of the rights of property." * * * "It is the right of every one, until *legally* deprived of that right, to determine for himself to what extent his property shall be expended or incumbered for such a purpose," etc. It is seen that the acts in question in this case give to the affidavit made by the county clerk the effect of a judgment of a court of record. It is the last final act prior to the issuing of bonds which, of themselves, create a public debt upon the town, and impose upon the local government the duty to raise money by tax to pay the same, with interest thereon. If, then, no judicial authority is created by this act, before which the citizens may test the integrity of the proceeding which may impose upon him this burden of debt, if he is not allowed his day in court; if this statute in its provisions proposes to work a change of property from one individual to a corporation, without the aid of a court or judicial magistrate; if, indeed, it is as claimed that this statute, by its own inherent force from the legislative power, extinguishes the rights of the citizen to a portion of his property and transfers it to another without judicial action of some kind, without due process of law it comes directly in conflict with the constitution.

Having already intimated that the acts in question did confer upon the county clerk a quasi-judicial power; and acting upon this assumption, I think the clerk erred in refusing and declining to take or allow proof to. be given in support of the objections of the opponents of the said bonding, and in refusing to regard the affidavits of the tax payers of the said town, filed in his office in opposition thereto, and in refusing to consider or to allow the withdrawal of the consent of said tax payers filed in his office, and in deciding and holding that he had no power to take other proof than that of the contents filed in his said office in favor of said bonding, and the acknowledgments written upon such contents.

But if we are wrong in our views upon the construction of the constitution, and of statutes passed for this purpose, I think there is not sufficient legal evidence appearing upon the consents of taxable inhabitants of said town filed, to prove that a majority of such tax payers, representing a majority of the taxable property of the

town, had given their consent. Among these petitioners consenting, is "The Delaware & Hudson Canal Company," represented upon the assessment roll by the title, "*President and Managers of the Delaware & Hudson Canal Company*," as being assessed for real estate to the amount of $250,620. The petition in this case is signed "The Delaware & Hudson Canal Co., by Geo. Tallbot Olyphant, president *pro tem.;* attested by a seal, and witnessed, "Charles P. Hartt, treasurer." The acknowledgment is made before a notary public by the witness, Charles P. Hartt, who deposed to his residence being in the city and county of New York, "and that *he is treasurer of said corporation;* that he was personally present at the execution of the above *written indenture*, and saw the common and corporate seal of the said *President, Managers and Company of the Delaware & Hudson Canal Company* affixed thereto, and the seal so affixed thereto is the common and corporate seal of the *President, Managers and Company of the Delaware & Hudson Canal Company;* that the above written *indenture* was duly sealed and delivered by, and as and for the act and deed of the said, *The President, Managers and Company of the Delaware & Hudson Canal Company*, for the uses and purposes therein mentioned, that the name of this deponent subscribed to the said deed as treasurer of the said corporation in attestation of the due execution and delivery of said *deed*, is of this deponent's own proper and *respective* handwriting; and that the name of George Tallbot Olyphant, president *pro tem.* of said corporation, also subscribed to said deed, in attestation of the due execution and delivery thereof, was so subscribed in this deponent's presence, and is of the said George Tallbot Olyphant's own proper and *respective* handwriting."

The statute requires that these consents shall be proved or acknowledged in the same manner as conveyances of real estate are proved or acknowledged. This acknowledgment is defective in several particulars. The county clerk received it as good and sufficient. There is no evidence that the petitioner, "The Delaware & Hudson Canal Company," is a corporation. If we may infer, from the proof of the acknowledgment, without other proof, that "The President, Managers and Company of the Delaware & Hudson Canal Company, who made the acknowledgment, is identical with "The Delaware & Hudson Canal Company," there is still no legal proof that either is a corporation, except it is to be *inferred* from

NOVEMBER TERM, 1873. 155

People ex rel. Town of Rochester v. Deyoe.

the proof before the notary public, that the seal affixed to the consent is the common and corporate seal of "The President, Managers and Company of the Delaware & Hudson Canal Company." The existence of a corporation was in no other manner proved. This is necessary. *Lumbard* v. *Aldrich,* 6 N. H. 269; 7 Conn. 219. Authority was shown that the corporation possessed the power to execute such a consent. This was necessary. The affixing of a corporate seal to an instrument requires an express authorization for that purpose. *Johnson* v. *Bush,* 3 Barb. 239, 240; *Hoyt* v. *Thompson,* 5 N. Y. 320; *Worrall* v. *Werner,* id. 229. 6 Serg. & Rawle, 12. The affixing of a corporate seal to an instrument, even where the officer affixing it is trusted with its custody, is not even *prima facie* evidence of his right to fix it to the particular instrument. This fact is necessary to be established before the officer who takes the acknowledgment. *Johnson* v. *Bush, supra.* There is no evidence that any resolution had been passed by the corporation to authorize the execution of such an instrument, or any instrument. This is necessary. See authorities, *supra.* There is no evidence that George Tallbot Olyphant is an officer, or even a member of the corporation. There is no evidence that he is the president. His signature, "*prest. p. t.,*" does not prove it, but the contrary. If we may assume that these abbreviations express or represent that he is the president *pro tem.,* there is no evidence that the president *pro tem.* has any authority to act, and it does not prove the absence of the real president. He is not shown to have the custody of the seal, or the right to use it, and the "*using it for the purpose therein mentioned*" does not prove it to be the purpose of the corporation. It may be only his own individual or private purposes. Neither president or other officer of a corporation have power to do any act requiring the use of the corporate seal, without the assent and authority of the board of directors. *Hoyt* v. *Thompson, supra,* 320, 334. The modern cases in the court of appeals enjoin upon us the necessity of construing these statutes, which have for their object the divesting of the citizen of his estate against his will, with a jealous watchfulness, and to give them that strict construction which is given to all statutes which are in derogation of the natural rights of the citizen, statutes which confer extraordinary power upon specially constituted tribunals, and which impose burdens upon the public

to favor corporations. A statute which thus deprives the citizen and the public of the ordinary safeguards of protection to rights of property in the ordinary courts, and deprives them of all opportunity of a judicial hearing and defense, is greatly obnoxious to a fair system of jurisprudence. I am, therefore, of opinion, that the *consent* of this corporation, if it be one, or of this tax payer, by whatever name or title it may appear upon the assessment roll of the town of Rochester, was not obtained according to the provisions of the statutes in question. See *People* v. *Smith,* 45 N. Y. 772; *People* v. *Hulbert,* 46 id. 110; *People* v. *Knowles,* 47 id. 415. If we are right in this view of construction, and as to the defect in this consent, the proceeding must be without jurisdiction. The amount of this assessment alone exceeds nearly three times the amount of property claimed to be in favor of creating the liability, and for this objection alone, the proceeding might be declared null and void. But this case is not the only one found to be defective in its non-compliance with the demands of the statute, as interpreted in the last three cited cases. Fifty-eight names are found upon the assessment roll, and which are counted as names giving their consents, which do not correspond with the names signed to the consents themselves, the difference being by the addition or omission of one or more middle letters in the name, or such an entirely different spelling of the name as to create uncertainty as to the identity of person, and an entire omission of proof of the *identity* of the person. The differences between assessment roll and consent are as follows, to wit: Maria B. Broadhead, with Maria Broadhead; Simon Bush, with Simon D. Bush; Barnus Cross, with Barney Crosse; Jacobus V. Coddington, with Joshua V. W. Coddington; Benjamin Collier, with Benjamin S. Calier; Maria Davenport (wid.), with Mary Davenport; William Dann, with William F. Dan. Affidavit proves the consent of William T. Dunn — James Dunn, with James T. W. Dunn; Thomas McDonick, for Thomas J. McDolen; John T. Osterhout, with Jonathan Osterhout; Isaiah, for Isaac; George Schoonmaker, with A. S. Schoonmaker; Stephen V. Warrens, with S. V. R. Wands, etc., etc. These names cannot be allowed as the same names without proof of identity. If disallowed, as they should be, by the rule (*People* v. *Hulbert, supra*), then the proceeding is void, for want of jurisdiction in obtaining a majority of names.

There are various other technical objections, some of which seem

also to be good, but I regard those already reviewed as sufficient to justify a reversal of the proceedings, with costs.

MILLER, P., J. and PARKER, J., concurred in result, except as to the allowance of costs.

*Proceedings reversed.*