## LAWTON *v.* STEELE.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 203. Submitted January 17, 1894. — Decided March 5, 1894.

It is within the power of a State to preserve from extinction fisheries in waters within its jurisdiction, by prohibiting exhaustive methods of fishing, or the use of such destructive instruments as are likely to result in the extermination of the young as well as the mature fish.

The provision in the statutes of New York, c. 591 of the Laws of 1880, as amended by c. 317 of the Laws of 1883, that nets set or maintained upon waters of the State, or on the shores of or islands in such waters, in violation of the statutes of the State enacted for the protection of fish, may be summarily destroyed by any person, and that it shall be the duty of certain officers to abate, remove, and forthwith destroy them, and that no action for damages shall lie or be maintained against any person for or on account of such seizure or destruction, is a lawful exercise of the police power of the State, and does not deprive the citizen of his property without due process of law, in violation of the provision of the Constitution of the United States.

THIS was an action at law instituted in the Supreme Court for the county of Jefferson by the plaintiffs in error against the defendant in error, together with Edward L. Sargent and Richard U. Sherman, for the conversion of fifteen hoop and fyke nets of the alleged value of $525. Defendants Steele and Sargent interposed a general denial. Defendant Sherman pleaded that he, with three others, constituted the "Commissioners of Fisheries" of the State of New York, with power to give directions to game and fish protectors with regard to the enforcement of the game law; that defendant Steele was

a game and fish protector, duly appointed by the governor of the State of New York, and that the nets sued for were taken possession of by said Steele, as such game and fish protector, upon the ground that they were maintained upon the waters of the State in violation of existing statutes for the protection of fish and game, and thereby became a public nuisance.

The facts were undisputed. The nets were the property of the plaintiffs, and were taken away by the defendant Steele and destroyed. At the time of the taking most of the nets were in the waters of the Black River Bay, being used for fishing purposes, and the residue were upon the shore of that bay, having recently been used for the same purpose. The plaintiffs were fishermen, and the defendant Steele was a state game and fish protector. The taking and destruction of the nets were claimed to have been justifiable under the statutes of the State relating to the protection of game and fish. Plaintiffs claimed there was no justification under the statutes, and if they constituted such justification upon their face, they were unconstitutional. Defendant Sherman was a state fish commissioner. Defendant Sargent was president of the Jefferson County Fish and Game Association. Plaintiffs claimed these defendants to be liable upon the ground that they instigated, incited, or directed the taking and destruction of the nets.

Upon trial before a jury a verdict was rendered, subject to the opinion of the court, in favor of the plaintiffs against defendant Steele for the sum of $216, and in favor of defendants Sargent and Sherman. A motion for a new trial was denied, and judgment entered upon the verdict for $216 damages and $166.09 costs. On appeal to the General Term this judgment was reversed, and a new trial ordered, and a further appeal allowed to the Court of Appeals. On appeal to the Court of Appeals, the order of the General Term granting a new trial was affirmed, and judgment absolute ordered for the defendant. 119 N. Y. 226. Plaintiffs thereupon sued out a writ of error from this court.

*Mr. Levi H. Brown* for plaintiffs in error.

*Mr. Elon R. Brown* for defendant in error.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

This case involves the constitutionality of an act of the legislature of the State of New York known as chapter 591, Laws of New York of 1880, as amended by chapter 317, Laws of New York of 1883, entitled "An act for the appointment of game and fish protectors."

By a subsequent act enacted April 15, 1886, c. 141:

"Section 1. No person shall at any time kill or take from the waters of Henderson Bay or Lake Ontario, within one mile from the shore, between the most westerly point of Pillar Point and the boundary line between the counties of Jefferson and Oswego, . . . any fish of any kind by any device or means whatever otherwise than by hook and line or rod held in hand. But this section shall not apply to or prohibit the catching of minnows for bait, providing the person using nets for that purpose shall not set them, and shall throw back any trout, bass, or any other game fish taken, and keep only chubs, dace, suckers, or shiners.

"Sec. 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and liable to a penalty of $50 for each offence."

By the act of 1880, as amended by the act of 1883:

"Sec. 2. Any net, pound, or other means or device for taking or capturing fish, or whereby they may be taken or captured, set, put, floated, had, found, or maintained, in or upon any of the waters of this State, or upon the shores of or islands in any of the waters of this State, in violation of any existing or hereafter enacted statutes or laws for the protection of fish, is hereby declared to be, and is, a public nuisance, and may be abated and summarily destroyed by any person, and it shall be the duty of each and every protector aforesaid and of every game constable to seize and remove and forthwith destroy the same, . . . and no action for damages shall lie or be maintained against any person for or on account of any such seizure or destruction."

This last section was alleged to be unconstitutional and void for three reasons : 1, as depriving the citizen of his property without due process of law ; 2, as being in restraint of the liberty of the citizen ; 3, as being an interference with the admiralty and maritime jurisdiction of the United States.

The trial court ruled the first of the above propositions in plaintiffs' favor, and the others against them, and judgment was thereupon entered in favor of the plaintiffs.

The constitutionality of the section in question was, however, sustained by the General Term and by the Court of Appeals, upon the ground of its being a lawful exercise of the police power of the State.

The extent and limits of what is known as the police power have been a fruitful subject of discussion in the appellate courts of nearly every State in the Union. It is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance. Under this power it has been held that the State may order the destruction of a house falling to decay or otherwise endangering the lives of passers-by; the demolition of such as are in the path of a conflagration; the slaughter of diseased cattle; the destruction of decayed or unwholesome food; the prohibition of wooden buildings in cities; the regulation of railways and other means of public conveyance, and of interments in burial grounds; the restriction of objectionable trades to certain localities; the compulsory vaccination of children; the confinement of the insane or those afflicted with contagious diseases; the restraint of vagrants, beggars, and habitual drunkards; the suppression of obscene publications and houses of ill fame; and the prohibition of gambling houses and places where intoxicating liquors are sold. Beyond this, however, the State may interfere wherever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests. *Barbier* v. *Connolly,* 113 U. S. 27; *Kidd* v. *Pearson,* 128

U. S. 1. To justify the State in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts. Thus an act requiring the master of a vessel arriving from a foreign port to report the name, birthplace, and occupation of every passenger, and the owner of such vessel to give a bond for every passenger so reported, conditioned to indemnify the State against any expense for the support of the persons named for four years thereafter, was held by this court to be indefensible as an exercise of the police power, and to be void as interfering with the right of Congress to regulate commerce with foreign nations. *Henderson* v. *New York*, 92 U. S. 259. A similar statute of California, requiring a bond for certain classes of passengers described, among which were "lewd and debauched women," was also held to show very clearly that the purpose was to extort money from a large class of passengers, or to prevent their immigration to California altogether, and was held to invade the right of Congress. *Chy Lung* v. *Freeman*, 92 U. S. 275. So in *Railroad Co.* v. *Husen*, 95 U. S. 465, a statute of Missouri which prohibited the driving of Texas, Mexican, or Indian cattle into the State between certain dates in each year was held to be in conflict with the commerce clause of the Constitution, and not a legitimate exercise of the police powers of the State, though it was admitted that the State might for its self-protection prevent persons or animals having contagious diseases from entering its territory. In *Rockwell* v. *Nearing*, 35 N. Y. 302, an act of the legislature of New York, which authorized the seizure and sale without judicial process of all animals found trespassing within

private enclosures, was held to be obnoxious to the constitutional provision that no person should be deprived of his property without due process of law. See also *Austin* v. *Murray*, 16 Pick. 121; *Watertown* v. *Mayo*, 109 Mass. 315; *The Slaughter-house Cases*, 16 Wall. 36; *In re Cheesebrough*, 78 N. Y. 232; *Brown* v. *Perkins*, 12 Gray, 89. In all these cases the acts were held to be invalid as involving an unnecessary invasion of the rights of property, and a practical inhibition of certain occupations harmless in themselves, and which might be carried on without detriment to the public interests.

The preservation of game and fish, however, has always been treated as within the proper domain of the police power, and laws limiting the season within which birds and wild animals may be killed or exposed for sale, and prescribing the time and manner in which fish may be caught, have been repeatedly upheld by the courts. Thus in *Smith* v. *Maryland*, 18 How. 71, it was held that the State had a right to protect its fisheries in Chesapeake Bay by making it unlawful to take or capture oysters with a scoop or drag, and to inflict the penalty of forfeiture upon the vessel employed in this pursuit. The avowed object of the act was to prevent the destruction of the oysters by the use of particular instruments in taking them. "It does not touch," said the court, "the subject of the common liberty of taking oysters save for the purpose of guarding it from injury to whom it may belong and by whomsoever it may be enjoyed." It was held that the right of forfeiture existed, even though the vessel was enrolled for the coasting trade under the act of Congress. So in *Smith* v. *Levinus*, 8 N. Y. 472, a similar act was held to be valid, although it vested certain legislative powers in boards of supervisors, authorizing them to make laws for the protection of shell and other fish. In *State* v. *Roberts*, 59 N. H. 256, which was an indictment for taking fish out of navigable waters out of the season prescribed by statute, it was said by the court: "At common law the right of fishing in navigable waters was common to all. The taking and selling of certain kinds of fish and game at certain seasons of the year tended to the destruction of the privilege or right by the destruction conse-

quent upon the unrestrained exercise of. the right. This is regarded as injurious to the community, and, therefore, it is within the authority of the legislature to impose restriction and limitation upon the time and manner of taking fish and game, considered valuable as articles of food or merchandise. For this purpose fish and game laws are enacted. The power to enact such laws has long been exercised, and so beneficially for the public that it ought not now to be called into question." *Commonwealth* v. *Chapin*, 5 Pick. 199; *McCready* v. *Virginia*, 94 U. S. 391; *Vinton* v. *Welsh*, 9 Pick. 87, 92; *Commonwealth* v. *Essex County*, 13 Gray, 239, 248; *Phelps* v. *Racey*, 60 N. Y. 10; *Holyoke Co.* v. *Lyman*, 15 Wall. 500; *Gentile* v. *State*, 29 Indiana, 409; *State* v. *Lewis*, 33 N. E. Rep. 1024.

As the waters referred to in the act are unquestionably within the jurisdiction of the State of New York, there can be no valid objection to a law regulating the manner. in which fishing in these waters shall be carried on. *Hooker* v. *Cummings*, 20 Johns. 91. The duty of preserving the fisheries of a State from extinction, by prohibiting exhaustive methods of fishing, or the use of such destructive instruments as are likely to result in the extermination of the young as well as the mature fish, is as clear as its power to secure to its citizens, as far as possible, a supply of any other wholesome food.

The main, and only real difficulty connected with the act in question is in its declaration that any net, etc., maintained in violation of any law for the protection of fisheries, is to be treated as a public nuisance, " and may be abated and summarily destroyed by any person, and it shall be the duty of each and every protector aforesaid and every game constable to seize, remove, and forthwith destroy the same." The legislature, however, undoubtedly possessed the power not only to prohibit fishing by nets in these waters, but to make it a criminal offence, and to take such measures as were reasonable and necessary to prevent such offences in the future. It certainly could not do this more effectually than by destroying the means of the offence. If the nets were being used in a manner detrimental to the interests of the public, we think it was

within the power of the legislature to declare them to be nuisances, and to authorize the officers of the State to abate them. *Hart* v. *Albany*, 9 Wend. 571; *Meeker* v. *Van Rensselaer*, 15 Wend. 397. An act of the legislature which has for its object the preservation of the public interests against the illegal depredations of private individuals ought to be sustained, unless it is plainly violative of the Constitution, or subversive of private rights. In this case there can be no doubt of the right of the legislature to authorize judicial proceedings to be taken for the condemnation of the nets in question, and their sale or destruction by process of law. Congress has assumed this power in a large number of cases, by authorizing the condemnation of property which has been made use of for the purpose of defrauding the revenue. Examples of this are vessels illegally registered or owned, or employed in smuggling or other illegal traffic; distilleries or breweries illegally carried on or operated, and buildings standing upon or near the boundary line between the United States and another country, and used as depots for smuggling goods. In all these cases, however, the forfeiture was decreed by judicial proceeding. But where the property is of little value, and its use for the illegal purpose is clear, the legislature may declare it to be a nuisance, and subject to summary abatement. Instances of this are the power to kill diseased cattle; to pull down houses in the path of conflagrations; the destruction of decayed fruit or fish or unwholesome meats, or infected clothing, obscene books or pictures, or instruments which can only be used for illegal purposes. While the legislature has no right arbitrarily to declare that to be a nuisance which is clearly not so, a good deal must be left to its discretion in that regard, and if the object to be accomplished is conducive to the public interests, it may exercise a large liberty of choice in the means employed. *Newark Railway* v. *Hunt*, 50 N. J. Law, 308; *Blasier* v. *Miller*, 10 Hun, 435; *Mouse's Case*, 12 Rep. 63; *Stone* v. *New York*, 25 Wend. 157, 173; *Am. Print Works* v. *Lawrence*, 21 N. J. Law, 248; 23 N. J. Law, 590.

It is not easy to draw the line between cases where property illegally used may be destroyed summarily and where judicial

proceedings are necessary for its condemnation. If the property were of great value, as, for instance, if it were a vessel employed for smuggling or other illegal purposes, it would be putting a dangerous power in the hands of a custom officer to permit him to sell or destroy it as a public nuisance, and the owner would have good reason to complain of such act, as depriving him of his property without due process of law. But where the property is of trifling value, and its destruction is necessary to effect the object of a certain statute, we think it is within the power of the legislature to order its summary abatement. For instance, if the legislature should prohibit the killing of fish by explosive shells, and should order the cartridges so used to be destroyed, it would seem like belittling the dignity of the judiciary to require such destruction to be preceded by a solemn condemnation in a court of justice. The same remark might be made of the cards, chips, and dice of a gambling room.

The value of the nets in question was but $15 apiece. The cost of condemning one, (and the use of one is as illegal as the use of a dozen,) by judicial proceedings, would largely exceed the value of the net, and doubtless the State would, in many cases, be deterred from executing the law by the expense. They could only be removed from the water with difficulty, and were liable to injury in the process of removal. The object of the law is undoubtedly a beneficent one, and the State ought not to be hampered in its enforcement by the application of constitutional provisions which are intended for the protection of substantial rights of property. It is evident that the efficacy of this statute would be very seriously impaired by requiring every net illegally used to be carefully taken from the water, carried before a court or magistrate, notice of the seizure to be given by publication, and regular judicial proceedings to be instituted for its condemnation.

There is not a State in the Union which has not a constitutional provision entitling persons charged with crime to a trial by jury, and yet from time immemorial the practice has been to try persons charged with petty offences before a police magistrate, who not only passes upon the question of guilt,

but metes out the proper punishment. This has never been treated as an infraction of the Constitution, though technically a person may in this way be deprived of his liberty without the intervention of a jury. *Callan* v. *Wilson*, 127 U. S. 540, and cases cited. So the summary abatement of nuisances without judicial process or proceeding was well known to the common law long prior to the adoption of the Constitution, and it has never been supposed that the constitutional provision in question in this case was intended to interfere with the established principles in that regard.

Nor is a person whose property is seized under the act in question without his legal remedy. If in fact his property has been used in violation of the act, he has no just reason to complain; if not, he may replevy his nets from the officer seizing them, or, if they have been destroyed, may have his action for their value. In such cases the burden would be upon the defendant to prove a justification under the statute. As was said by the Supreme Court of New Jersey in a similar case, *Am. Print Works* v. *Lawrence*, 21 N. J. Law, 248, 259: "The party is not, in point of fact, deprived of a trial by jury. The evidence necessary to sustain the defence is changed. Even if the party were deprived of a trial by jury, the statute is not, therefore, necessarily unconstitutional." Indeed, it is scarcely possible that any actual injustice could be done in the practical administration of the act.

It is said, however, that the nets are not in themselves a nuisance, but are perfectly lawful acts of manufacture, and are ordinarily used for a lawful purpose. This is, however, by no means a conclusive answer. Many articles, such, for instance, as cards, dice, and other articles used for gambling purposes, are perfectly harmless in themselves, but may become nuisances by being put to an illegal use, and in such cases fall within the ban of the law and may be summarily destroyed. It is true that this rule does not always follow from the illegal use of a harmless article. A house may not be torn down because it is put to an illegal use, since it may be as readily used for a lawful purpose, (*Ely* v. *Supervisors*, 36 N. Y. 297,) but where minor articles of personal property are devoted to such

use the fact that they may be used for a lawful purpose would not deprive the legislature of the power to destroy them. The power of the legislature to declare that which is perfectly innocent in itself to be unlawful is beyond question, (*People* v. *West*, 106 N. Y. 293,) and in such case the legislature may annex to the prohibited act all the incidents of a criminal offence, including the destruction of property denounced by it as a public nuisance.

In *Weller* v. *Snover*, 42 N. J. Law, 341, it was held that a fish warden for a county, appointed by the governor, had the right, under an act of the legislature, to enter upon land and destroy a fish basket constructed in violation of the statute, together with the materials of which it was composed, so that it might not again be used. It was stated in that case that "after a statute has declared an invasion of a public right to be a nuisance it may be abated by the destruction of the object used to effect it. The person who, with actual or constructive notice of the law, sets up such nuisance cannot sue the officer whose duty it has been made by the statute to execute its provisions." So in *Williams* v. *Blackwall*, 2 H. & C. 33, the right to take possession of or destroy any engine placed or used for catching salmon in contravention of law was held to extend to all persons, and was not limited to conservators or officers appointed under the act.

It is true there are several cases of a contrary purport. Some of these cases, however, may be explained upon the ground that the property seized was of considerable value — *Ieck* v. *Anderson*, 57 California, 251, boats as well as nets; *Dunn* v. *Burleigh*, 62 Maine, 24, teams and supplies in lumbering; *King* v. *Hayes*, 80 Maine, 206, a horse; in others the court seems to have taken a more technical view of the law than the necessities of the case or an adequate protection of the owner required. *Lowry* v. *Rainwater*, 70 Missouri, 152; *State* v. *Robbins*, 124 Indiana, 308; *Ridgeway* v. *West*, 60 Indiana, 371.

Upon the whole, we agree with the Court of Appeals in holding this act to be constitutional, and the judgment of the Supreme Court is, therefore,

*Affirmed.*

MR. CHIEF JUSTICE FULLER (with whom concurred MR. JUS-TICE FIELD and MR. JUSTICE BREWER) dissenting.

In my opinion the legislation in question, so far as it authorizes the summary destruction of fishing nets and prohibits any action for damages on account of such destruction, is unconstitutional.

Fishing nets are in themselves articles of property entitled to the protection of the law, and I am unwilling to concede to the legislature of a State the power to declare them public nuisances, even when put to use in a manner forbidden by statute, and on that ground to justify their abatement by seizure and destruction without process, notice, or the observance of any judicial form.

The police power rests upon necessity and the right of self-protection, but private property cannot be arbitrarily invaded under the mere guise of police regulation, nor forfeited for the alleged violation of law by its owner, nor destroyed by way of penalty inflicted upon him, without opportunity to be heard.

It is not doubted that the abatement of a nuisance must be limited to the necessity of the occasion, and, as the illegal use of fishing nets would be terminated by their withdrawal from the water and the public be fully protected by their detention, the lack of necessity for the arbitrary proceedings prescribed seems to me too obvious to be ignored. Nor do I perceive that the difficulty which may attend their removal, the liability to injury in the process, and their comparatively small value ordinarily, affect the principle, or tend to show their summary destruction to be reasonably essential to the suppression of the illegal use. Indeed, I think that that argument is to be deprecated as weakening the importance of the preservation, without impairment, in ever so slight a degree, of constitutional guaranties.

I am, therefore, constrained to withhold my assent to the judgment just announced, and am authorized to say that Mr. JUSTICE FIELD and MR. JUSTICE BREWER concur in this dissent.