178 So.2d 714 (1965)
Bruce Adrian MOUNIER, Appellant,
v.
STATE of Florida, Appellee.
Vernon Russell THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
Nos. 33521, 33522.
Supreme Court of Florida.
April 14, 1965.
Rehearing Denied October 13, 1965.
Robert E. Brandt, Miami, for appellants.
Earl Faircloth, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
DREW, Chief Justice.
These two appeals were consolidated and will be disposed of in one opinion inasmuch as the points involved in both appeals are identical.
The defendants in the court below, Thompson and Mounier, were arrested by officers of the Department of Conservation for spearfishing in a prohibited area in Monroe County contrary to the provisions of Section 370.172(2), Florida Statutes 1963, F.S.A. They were tried before the court without a jury, adjudged guilty and sentenced to pay a fine of $500 each or serve six months in the county jail.
During the course of the trial, a motion was made to quash the information on the ground that the statute, the violation of which was charged therein, was unconstitutional *715 and invalid in that "it offends the equal protection of the laws clause of the State and Federal Constitutions; that the Act was a local act passed under the guise of a general law; that the classification upon which the Statute was based is unreasonable, arbitrary and possessed of no unique character; that the Statute was arbitrary and discriminatory and that it discriminated against a class of persons; that the Statute countervenes [sic] and is repugnant to the provisions of the State and Federal Constitutions, guaranteeing to citizens the right to due process of law. It is unconstitutional because it is arbitrary, harsh and discriminatory, and it countervenes [sic] the spirit and the intent of the United States Constitution and the Constitution of the State of Florida. It violates the Declaration of Rights and it violates Section 24 of the Declaration of Rights."[1] The motion to quash was overruled, thereby passing directly upon the validity of this statute.[2] Such ruling in an appeal from the final judgment of conviction entered after trial upon the merits brings this case within our appellate jurisdiction on direct appeal.
These cases must be reversed because the proof of the State clearly established the fact that the offense upon which these defendants were convicted was not committed in Monroe County. Having reached such conclusion, we are not required nor should we pass upon the validity of the subject statute. It is a fundamental principle that courts will not do so where the case before them may be disposed of upon any other ground. This result does not, however, divest us of jurisdiction under the Constitution. In the Lissenden case,[3] we held that where a trial court directly passes upon the validity of a state statute, this Court has jurisdiction of and should determine the appeal even though in its consideration of the case it is decided that the action of the trial court in passing upon the jurisdictional issue of statutory validity was unnecessary to the disposition of the cause.
We now direct our attention to the basic issue in these cases. Was the offense for which these defendants were convicted in Monroe County, Florida committed within said county?
The statute under which the indictment was made provides in its pertinent provisions:
"(2) It is unlawful for any person, firm or corporation to take any fish by means of any spear, gig or other similar device in an area in Monroe county known as the Upper Keys, or to engage in any spearfishing in said area; said area shall include all salt waters under the jurisdiction of the state board of conservation beginning at the county line between Dade and Monroe counties and running south, including all of the keys down to and including Long Key." 370.172(2), F.S. 1963, F.S.A. (Emphasis supplied.)
At a preliminary hearing and during the trial it was conceded by the State that the violation occurred at Davis Reef which is 3 4/5 nautical miles off Plantation Key in a southeasterly direction.
Before proceeding to a further discussion of the question, we deem it pertinent to point out that the statute above quoted makes spearfishing unlawful in an area "in Monroe county known as the Upper Keys." The language following the semicolon to the effect that said area shall include *716 all waters under the jurisdiction of the State Board of Conservation, etc. must be construed as relating only to that area lying within Monroe County. Whether the State Board of Conservation or the State of Florida through any other agency has jurisdiction over the waters or over the conduct of these defendants where the offense was committed or beyond that into the open ocean is a question not presented here and one on which we do not pass.[4] We are proscribed in our disposition of these cases by the limited issue involved.
The boundaries of Florida, as fixed by the Constitution at the time this offense was committed, appear in the footnote.[5] In this area the boundary is three geographical miles from the Florida coast line, "meaning the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters; * * *" The boundaries of Monroe County are defined as "so much of the State of Florida as is situated south of the county of Collier and west and south of the county of Dade."[6] Section 6.11, F.S.A. defines the coast line as follows:
"6.11 Boundary of Florida, east coast.  Wherever the coast line of the state, both along the east coast of the mainland and along the Florida Keys, is in direct contact with the waters of the Atlantic ocean or the Florida Straits, which latter is an arm of the Atlantic ocean, the seaward boundary of the state is hereby fixed, defined, and interpreted as, and is hereby extended to, a line three geographical miles distant from said coast line. The term `coast line' means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters."
*717 Organic law requires that in all criminal prosecutions the accused have the right to a public trial in the county where the crime was committed.[7]
No citation of authority is required or necessary to support the proposition that the failure of the State to prove that the crime was committed in the county where the trial took place is fatal.
The record of the hearing reveals that both the county solicitor and the trial judge were laboring under the mistaken view that the constitutional boundaries of the State of Florida extended to the edge of the Gulf Stream. This was the boundary of the State under Article I of the Constitution prior to the adoption of Amended Article I at the general election in 1962. In 1962, however, the boundaries of Florida were changed by the people to include only a distance seaward of three geographic miles in this particular area. It appearing without any question that the offense was committed beyond this line, it follows that the conviction was a nullity and that these defendants should have been discharged.
Reversed and remanded with directions to discharge these defendants and restore to them the personal property which was confiscated by the State.
It is so ordered.
THORNAL, O'CONNELL, CALDWELL and HOBSON (Retired), JJ., concur.
THOMAS, J., dissents with Opinion.
ERVIN, J., dissents with Opinion.
THOMAS, Justice (dissenting):
I vigorously dissent for the reasons given in my dissenting opinion in Lissenden v. Board of County Commissioners, 116 So.2d 632. I still think it is dead wrong to entertain a case here because the trial court has passed on the constitutionality of an act and then evade that issue by resorting to the rule that constitutionality will not be decided if the case can be determined without it.
ERVIN, Justice (dissenting).
I do not believe this case should be decided on the basis of whether the spearfishing acts alleged to constitute criminal offenses occurred within the legal boundaries of the State of Florida as such boundaries are prescribed by the State Constitution and laws of the State. Moreover, under the Submerged Lands Act of 1953 (43 U.S.C. § 1301 et seq.) as construed in the Tidelands cases in United States v. Florida, 363 U.S. 121, 80 S.Ct. 1026, 4 L.Ed.2d 1096 (1960), and United States v. Louisiana, 363 U.S. 1, 80 S.Ct. 961, 4 L.Ed.2d 1025, the actual legal boundaries of the State are yet to be officially determined. This Court should take judicial notice that the task of surveying and mapping the boundaries of the State pursuant to said Act as construed in the above decisions has not been completed *718 nor have the State and the United States reached agreement as to the exact lines of the legal boundaries of the State as recognized by the Submerged Lands Act.
Whether the spearfishing here involved took place within the legal boundaries of the State is therefore an open question. The Court should not put its imprimatur upon a determination of the location of a portion of the State boundary made in the local court prior to an official determination thereof by the State in agreement with the Federal Government.
A cursory reading of the Submerged Lands Act, particularly its definitions of the terms "boundaries" and "coast line," will reflect the complexity of the problem of determining the exact boundary line of the State along the eastern side of the Florida Keys. The Florida Keys, an archipelago of numerous islands and outcroppings of shoals and mangrove flats, present many problems in determining the actual line of boundary of the State of Florida in this area.
But aside from the question concerning where the State's boundary line may exist within the contemplation of the Submerged Lands Act, its location is immaterial insofar as the disposition of the instant case is concerned. Florida is not necessarily restricted to its legal boundaries as provided in its Constitution and laws as recognized by the Submerged Lands Act in conserving and regulating the taking and manner of taking of fish in coastal waters offshore of Florida and particularly is this true with respect to its own citizens.
In Skiriotes v. Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193, rehearing denied 313 U.S. 599, 61 S.Ct. 1093, 85 L.Ed. 1552, it was said:
"* * * Even if it were assumed that the locus of the offense was outside the territorial waters of Florida, it would not follow that the State could not prohibit its own citizens from the use of the described divers' equipment [sponge taking equipment] at that place. * * *" (text 61 S.Ct. p. 929, 85 L.Ed. p. 1200)
The Court reaffirmed this statement in United States v. Louisiana, supra, where it cited the Skiriotes case and said:
"* * * Some of the acts alleged constituted police power measures which a State can enforce against its citizens beyond its boundaries. * *" (363 U.S. 79, 80 S.Ct. 1004)
In Manchester v. Commonwealth of Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891), headnotes 5 and 6 read as follows:
"5. The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and, except so far as any right of control over this territory has been granted to the United States, this control remains with the State.
"6. Within what are recognized by the law of nations as the territorial limits of States, a State can define its boundaries on the sea and the boundaries of its counties; Massachusetts can include Buzzard's Bay within the limits of its counties."
In Louisiana v. Mississippi, 202 U.S. 1, 26 S.Ct. 408, 50 L.Ed. 913, the Court stated:
"The maritime belt is that part of the sea which, in contradistinction to the open sea, is under the sway of the riparian states, which can exclusively reserve the fishery within their respective maritime belts for their own citizens, whether fish, or pearls, or amber, or other products of the sea. * * *"
In United States v. Louisiana, supra, it is stated:
"* * * It is recognized, however, that a nation may extend its national *719 authority into the adjacent sea to a limited distance for various purposes. For hundreds of years, nations have asserted the right to fish, to control smuggling, and to enforce sanitary measures within varying distances from their seacoasts. Early in this country's history, the modern notion had begun to develop that a country is entitled to full territorial jurisdiction over a belt of waters adjoining its coast. However, even this jurisdiction is limited by the right of foreign vessels to innocent passage. * * *"
The 4th headnote in Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385, reads:
"4. The preservation of game and fish is within the proper domain of the police power."
Admittedly the United States by Act of Congress could extend the admiralty and maritime power of the United States to the conservation of fish life in the subject coastal waters and under the 3rd Article of the Constitution of the United States could extend the jurisdiction of the Federal District Courts to try cases involving violations of such conservation regulations, but this the Congress has not done. See United States v. Bevans, 3 Wheat. 336, 4 L.Ed. 404. It has left this exercise of police power with the State. Appellants seek a judicially declared "hiatus" in the law wherein there will be no regulation.
This case involves no conflict of law or authority between the State of Florida and the United States, nor does it involve international law. There has been no preemption of the regulation of the subject matter by the Federal Government. The case relates solely to domestic regulations of the State designed to conserve the taking or manner of taking of fish within coastal waters lying off the seacoast of Florida. These waters are within the national maritime belt and are close enough to the mainland to be under the sway of the State of Florida, to which they are riparian.
It may be the alleged offenses of spearfishing occurred immediately outside the legal boundary of the State. However, the prosecution is directed against defendants who are citizens of the State and the authority to so prosecute them appears to be within the scope of the police power of the State under the rule announced in Skiriotes, even though the acts of spearfishing may have been committed just outside the legal boundary of the State. The State has a vital conservation interest in the subject regulated, that is to say the taking of fish in the manner prohibited. We agree with the Attorney General that it would make a mockery of the regulation if spear fishermen could "put a tape measure on this segment of Florida's natural resources" and spear fish at will just outside the three-mile limit. The depletion of fish in the area would be achieved with equal effectiveness though the spearfishing were done just beyond the State boundary line.
This Court knows in a general way the nature of the area offshore the seacoast of the Upper Keys in Monroe County, Florida. It is one of the finest fishing grounds of the State. It is also a resort and recreational area that attracts many thousands of tourists, including numerous sport fishermen. In this respect the Court can take notice of the existence of the John Pennekamp Coral Reef State Park located in the Upper Keys area. See Allen Morris' Florida Handbook (1963-1964) p. 394; also F.S. § 592.17, F.S.A. See also Proclamation of then President Dwight D. Eisenhower establishing the Key Largo Coral Reef Preserve, U.S. Code Congressional and Administrative News, Vol. I, 86th Congress, Second Session 1960, pp. 1596 and 1597. It describes the area embracing the Pennekamp Coral Reef State Park and indicates that the preserve lies both within and without the three-mile state boundary limit. Pursuant *720 to agreements reached between the State and the Federal Government, the State has agreed to conserve the marine life, including tropical fish in this preserve. The tropical fish life in this park in addition to the other marine life, is an added attraction and its conservation is most desirable to the scenic value of the park. The regulation of spearfishing in the Upper Keys area is protective of the Park and highly in the public interest.
To avoid depletion of the fish life in the waters of the Upper Keys, Ch. 57-303, F.S. § 370.172, F.S.A., was enacted. It is noted also that the 1963 Florida Legislature has enacted Ch. 63-1662, Special Acts of 1963, which is of similar effect as F.S. § 370.172, F.S.A., subject to ratification by referendum.
The statutory regulation, in describing the area where spearfishing is unlawful, reads as follows:
"370.172 Spearfishing prohibited; exemptions; penalty. 
* * * * * *
"(2) It is unlawful for any person, firm or corporation to take any fish by means of any spear, gig or other similar device in an area in Monroe county known as the Upper Keys, or to engage in any spearfishing in said area; said area shall include all salt waters under the jurisdiction of the state board of conservation beginning at the county line between Dade and Monroe counties and running south, including all of the keys down to and including Long Key." (Emphasis supplied.)
This language is sufficient to include the coastal area waters along the Upper Keys which are under the riparian sway of the State. It is not necessary to spell out in the regulation the extra-territorial jurisdiction of the subject exercise of police power by the State. It exists concomitantly and as a necessary incident to the express authority to be exercised in the area referred to in the statute. It is an implied attribute to that express authority and is part and parcel of state sovereignty that has been judicially recognized by the Supreme Court of the United States in the Skiriotes and other cases. Conservation of fish and marine life by the State through reasonable and constitutional regulations logically extends throughout the marginal sea lying off the State's seacoast and does not necessarily end at the legal boundary line of the State, absent conflict with the jurisdiction of another state or the United States or with international law. The above statute extends to said limits in order to realistically provide the conservation intended. Moreover, this construction is confirmed by reference to F.S. Ch. 370, F.S.A., relating to the powers and jurisdiction of the State Board of Conservation.
F.S. Section 370.02(5), F.S.A. reads as follows:
"(5) DIVISION OF SALT WATER FISHERIES; POWERS AND DUTIES. 
"(a) It shall be the duty of the division of salt water fisheries to preserve, manage, and protect the marine, crustacean, shell and anadromous fishery resources of the state in the waters thereof; to regulate the operations of all fishermen and vessels of this state engaged in the taking of such fishery resources within or without the boundaries of such state waters, to issue licenses or provide for the issuance of licenses, prescribed by the legislature, for taking of the products of any or all such fisheries and the processing at sea or on shore within this state; to secure and maintain statistical records of the catch of each such species by various gear, by areas and by other appropriate classifications, to conduct scientific, economic and other studies and research, and to enter into contracts for such studies and research, all of which duties and *721 operations shall be directed to the broad objective of managing such fisheries in the interest of all people of the state, to the end that they shall produce the maximum sustained yield consistent with the preservation and protection of the breeding stock." (Emphasis supplied.)
I would affirm the judgment below.

ON PETITION FOR REHEARING
PER CURIAM.
The petition for rehearing has been considered and hereby denied.
It is so ordered.
THORNAL, C.J., and DREW, O'CONNELL and CALDWELL, JJ., concur.
HOBSON, (Ret.) J., concurs specially in denial of rehearing with opinion.
THOMAS and ERVIN, JJ., dissent.
HOBSON, Justice (Ret.) (concurring specially).
In order that my concurrence in the opinion prepared by Mr. Chief Justice Drew may be clearly understood, I wish to state that the information in each of these cases charges that the alleged offense was committed in Monroe County, yet the undisputed proof shows that such was not the case. It is my understanding of the law that in criminal, as well as civil, cases allegata et probata must meet and correspond. Our decision must be one of reversal of the judgments of conviction.
Were it not for this fatal technical defect I would agree with Mr. Justice Ervin's able dissent.
Although I am in accord with the majority view that it is unnecessary  therefore improper  to pass upon the constitutionality of Section 370.172(2), Florida Statutes 1963, F.S.A., I subscribe to the gravamen of Mr. Justice Ervin's treatise which is lucidly stated by him in the following language: "Florida is not necessarily restricted to its legal boundaries as provided in its Constitution and laws as recognized by the Submerged Lands Act in conserving and regulating the taking and manner of taking of fish in coastal waters offshore of Florida and particularly is this true with respect to its own citizens."
If the question of the constitutionality of the subject statute were properly before this Court for settlement I would say there can be no doubt but that the legislature under the authority of the police power of the sovereign State of Florida could have passed such a law regulating  even prohibiting  spear or gig fishing in designated waters both within and without the legal boundaries of Florida as delineated in Article I, Florida Constitution, F.S.A., unless it should collide with Federal or International law. Moreover, I would approach the query concerning the validity of said statute, since it is patently ambiguous, by first construing it in the light of the intent and purpose which pervaded the legislative mind at the time of, and which induced, the passage of Section 370.172(2), Fla. Stat. 1963, F.S.A. It is noted that Sec. 33, Article XVI of the State Constitution authorizes the Legislature to provide for the conservation of salt water fish and salt water products without regard to uniformity of application.
Obviously conservation was the polar star which motivated the enactment of this law. It can hardly be gainsaid that the summum bonum is accommodated by it. The citizens of this State are benefitted individually as well as collectively when consideration is given to the greatest of our economic factors  tourism. Then too it must be remembered that an act of the legislature should never be held unconstitutional unless and until the invalidity thereof is made clearly apparent.
Simply stated I agree to the judgments of reversal but disagree with the obiter *722 dicta of the majority opinion wherein the proper construction to be given Section 370.172(2), Fla. Stat. 1963, F.S.A. is discussed. I concur in the conclusion reached upon the subject of proper construction of said statute, in the same type of dissertation appearing in the dissenting opinion.
NOTES
[1] The quoted language is taken from the transcript of record. The motion was made orally at the hearing held on the motion to quash the information.
[2] "Appeals from trial courts may be taken directly to the supreme court, as a matter of right, * * * from judgments * * * directly passing upon the validity of a state statute * * *." Article V, Section 4(2), Florida Constitution, F.S.A.
[3] P.C. Lissenden v. Board of County Commissioners, Fla. 1959, 116 So.2d 632.
[4] Cf. Skiriotes v. State, 144 Fla. 220, 197 So. 736, affirmed Skiriotes v. State of Florida, 313 U.S. 69, 61 Sup.Ct. 924, 85 L.Ed. 1193, rehearing denied 313 U.S. 599, 61 Sup.Ct. 1093, 85 L.Ed. 1552.
[5] "The state boundaries are: Begin at the mouth of the Perdido River, which for the purposes of this description is defined as the point where latitude 30° 16'53" north and longitude 87° 31'06" west intersect; thence to the point where latitude 30° 17'02" north and longitude 87° 31'06" west intersect; thence to the point where latitude 30° 18'00" north and longitude 87° 27'08" west intersect; thence to the point where the center line of the Intracoastal Canal (as the same existed on June 12, 1953) and longitude 87° 27'00" west intersect; the same being in the middle of the Perdido River; thence up the middle of the Perdido River to the point where it intersects the south boundary of the State of Alabama, being also the point of intersection of the middle of the Perdido River with latitude 31° 00'00" north; thence east, along the south boundary line of the State of Alabama, the same being latitude 31° 00'00", north to the middle of the Chattahoochee River; thence down the middle of said river to its confluence with the Flint River; thence in a straight line to the head of the St. Mary's River; thence down the middle of said river to the Atlantic Ocean, and extending therein to a point three (3) geographic miles from the Florida coast line, meaning the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters; thence southeastwardly following a line three (3) geographic miles distant from the Atlantic coast line of the state and three (3) leagues distant from the Gulf of Mexico coast line of the state to and around the Tortugas Islands; thence northeastwardly, three (3) leagues distant from the coast line, to a point three (3) leagues distant from the coast line of the mainland; thence north and northwestwardly, three (3) leagues distant from the coast line, to a point west of the mouth of the Perdido River, three (3) leagues from the coast line, as measured on a line bearing 0° 01'00" west from the point of beginning; thence along said line to the point of beginning.

"The legislature may extend the coastal boundaries to such limits as the laws of the United States or international law may permit." Article I, Constitution of the State of Florida.
[6] Section 7.44, Florida Statutes 1963, F.S.A.
[7] "§ 11. Rights of accused; speedy trial; etc.  In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury, in the county where the crime was committed, and shall be heard by himself, or counsel, or both, to demand the nature and cause of the accusation against him, to meet the witnesses against him face to face, and have compulsory process for the attendance of witnesses in his favor, and shall be furnished with a copy of the indictment against him." Declaration of Rights, Constitution of the State of Florida.

"AMENDMENT VI.
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defence." Constitution of the United States.