ERVIN, Chief Justice
(dissenting):
Appellants Freeman Bateman and Herman E. Potter were charged with and convicted of the crime of shrimping in a prohibited area described in F.S. Section 370.151, F.S.A., as the Tortugas shrimp beds. Appellants’ principal contention on appeal is that the alleged offense charged against them did not occur in Monroe County, Florida.
Reference is here made to that portion of the description of the shrimp bed contained in F.S. Section 370.151(3) (d), F.S.A., which Appellants claim lies outside the legal boundary of Monroe County and in which the alleged prohibited shrimping violation occurred, reading as follows:
“Beginning at the intersection of the Florida boundary line in the straits of Florida with the meridian longitude 82° 00' west of Greenwich; running thence westerly along said Florida boundary line in the straits of Florida to the meridian longitude 82° 23' west of Greenwich; running thence due north along said meridian longitude 82° 23' to its intersection with the Florida boundary line in the Gulf of Mexico, which is a straight line drawn from the Island of Dry Tortugas on a bearing of 75° from magnetic north; running thence easterly along said Florida boundary line to its intersection with said meridian longitude 82° 0(7; running thence southerly along said meridian longitude 82° (XY to the point of beginning.” (Enacted as Ch. 61-470 in 1961).
Monroe County’s boundary is described in F.S. Section 7.44, F.S.A., as follows:
“So much of the State of Florida as is situated south of the county of Collier *627 and west or south of the county of Dade, constitutes the county of Monroe.”
It follows, of course, from this description that all submerged lands or navigable waters in the southermost portion of the state of Florida that do not lie in Collier and Dade counties are a part of Monroe County. Appellants contend Section 370.-151(3) (d) is unconstitutional in that it prohibits shrimping in an offshore described area that lies outside the constitutional boundaries of the State and Monroe County.
It is obvious from a cursory inspection of relevant official maps that the above described portion of the Tortugas shrimp bed is not in either Collier or Dade county, but that if it is within the territorial or constitutional boundaries of the State it has to be within Monroe County.
In discussing Appellants’ contention that the above described portion of the Tortugas shrimp bed or nursery area lies outside the territorial boundary of the State and Monroe County, reference is made to pertinent facts including historical data and judicial decisions concerning the boundary of the State in the area involved in this controversy.
As a part of Florida’s Constitution of 1868, the first article therein contained a description of the boundaries claimed by the State which as related to the particular area involved in this case is as follows:
“ * * * thence southwestwardly along along the edge of the Gulf Stream and Florida Reefs to and including the Tor-tugas Islands; thence northeastwardly to a point three leagues from the mainland ; thence northwestwardly three leagues from the land * *
This same Article I of the 1868 Constitution was reiterated and placed verbatim in Article I of the Constitution of 1885, effective January 1, 1887. Thus from 1868 until 1947, the boundaries of the State of Florida remained, without dispute, as described and set forth in the said Article I.
In 1947, the first of the so-called “tidelands cases,” United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 was decided by the United States Supreme Court, followed by United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950), and United States v. Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). These decisions held that the United States was possessed of paramount rights in, and full dominion and power over the lands, minerals, and other things lying seaward of the ordinary low water mark on the coast of the states of California, Louisiana, and Texas, and outside of the inland waters of said states; and that said states had no title thereto or property interest therein.
To overcome the effect and impact of these holdings by the Supreme Court of the United States, Congress passed the Submerged Lands Act, Chapter 65, Public Law 31, First Session of the 83rd Congress, on May 22, 1953.
Subsection (b) of Section 2, Chapter 65, Public Law 31 (now 43 U.S.C., Section 1301(b)), defined the term “boundaries” as used in said statute as follows:
“(b) The term ‘boundaries’ includes the seaward boundaries of a State, or its boundaries in the Gulf of Mexico or any of the Great Lakes, as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress * * * but in no event shall the term ‘boundaries’ or the term ‘lands beneath navigable waters’ be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean or more than three marine leagues into the Gulf of Mexico * *
Subsection (c) of Section 2, now 43 U.S.C., Section 1301(c), defined the term “coast line” as follows:
“(c) The term ‘coast line’ means the line of ordinary low water along that portion of the coast which is in direct *628 contact with the open sea and the line marking the seaward limit of inland waters * *
By this act, the United States Congress in 1953 recognized and confirmed the seaward boundaries of the State of Florida as set forth in the Constitution of 1868 which was approved by the Congress upon Florida’s readmission into the Union on Tune 25, 1868.
■ The Supreme Court of the United States, in United States v. States of Louisiana, etc. and Florida, 363 U.S. 121, 80 S.Ct. 961, 1026, 4 L.Ed.2d 1025, 1096 (1960), which arose as a result of the passage of the Submerged Lands Act, held that the Florida Constitution of 1868 had been “heretofore approved by Congress” on June 25, 1868, and as a consequence said, “We hold that the Submerged Lands Act grants Florida a three-marine-league belt of land under the Gulf, seaward from its coastline, as described in Florida’s 1868 Constitution.”
Subsequent to the passage of the Submerged Lands Act, supra, and the decision of the United States Supreme Court in United States v. Florida, the State of Florida in 1962, by constitutional amendment, amended Article I of the State Constitution of 1885.
The boundary under the 1962 constitutional amendment, insofar as here pertinent, reads as follows:
“ * * * to the head of the St. Marys River; thence down the middle of said river to the Atlantic Ocean, and extending therein to a point three (3) geographic miles from the Florida coast line, meaning the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and that line marking the seaward limit of inland waters; thence south-eastwardly following a line three (3) geographic miles distance from the Atlantic coast line of the state and three (3) leagues distant from the Gulf of Mexico coast line of the state to and around the Tortugas Islands; thence northeastwardly, three (3) leagues distant from the coast line, to a point three (3) leagues distant from the coast line of the mainland; thence north and north-westwardly, three (3) leagues distant from the coast line, to a point west of the mouth of the Perdido River, three (3) leagues from the coast line * *
The State of Florida revised its constitution in 1968, effective January 7, 1969. In Section 1 of Article II thereof, the boundary around the Tortugas Islands and from said Islands to a point three leagues distant from the mainland was more graphically reiterated. Insofar as here pertinent, the boundary line under the 1968 Constitution reads as follows:
“ * * * thence in a southerly direction along the edge of the Gulf Stream or along a line three geographic miles from the Atlantic coastline and three leagues distant from the Gulf of Mexico coastline, which ever is greater, to and through the Straits of Florida and westerly including the Florida reefs, to a point due south of the three leagues from the southernmost point of the Marquesas Keys; thence westerly along a straight line to a point due south of and three leagues from Loggerhead Key, the westernmost of the Dry Tortugas Islands ; thence westerly, northerly and easterly along the arc of a curve three leagues distant from Loggerhead Key to a point due north of Loggerhead Key; thence northeast along a straight line to a point three leagues from the coastline of Florida; thence northerly and westerly three leagues distant from the coastline to a point west of the mouth of the Perdido River three leagues from the coastline * *
It is the position of the State of Florida that the boundary of the State around the Tortugas Islands and from said islands to the mainland of Florida is a line drawn around and three leagues distant from the line of ordinary low water of the most *629 southern, most western, and most northern of the islands of the Dry Tortugas group and thence northeast on a straight line (045) degrees true to a point three leagues distant from the line of ordinary low water from the mainland, and that its boundary in this area has remained unchanged since originally placed in the readmission Constitution of 1868, up to and including the present day.
The call, “northeastwardly,” meaning to or toward the northeast and the line between north and east, was used in both the Constitution of 1868 and the 1962 Constitutional Amendment. In 1968 the framers of the revision employed the phrase, “northeast along a straight line,” to synonymously and more graphically reiterate the boundary from the Tortugas to the mainland.
The importance of the Bay of Florida (the water area lying between the Florida Keys archipelago extending to the Tor-tugas and the Florida mainland) and its boundary to the vital interests of the State of Florida and, indeed, to the United States, has long been recognized and the historical status of this bay has long been settled by history. Since at least 1868, the State of Florida has asserted its sovereignty in this bay as witnessed by the description of the boundaries of the State in the 1868 Constitution. The vital interest of self defense and the strategic military importance of the bay with its unique geographic configuration was evidenced by the construction of Fort Jefferson in the Tortugas Islands.
The well-established control and usage of this area has continued to the present day. The vast economic importance of the bay to the people of this state has long been recognized. For nearly a quarter of a century the state by legislation sought to preserve and conserve the vast fishing grounds in the vicinity of the Dry Tor-tugas Islands to insure their fertility and productivity for future generations. The historic character of Florida Bay, even to the name, is established beyond question.
From the foregoing it is logical to conclude that the boundary of the State of Florida around the Dry Tortugas Islands and from said islands to the mainland of Florida is a line drawn around and three leagues distant from the line of ordinary low water of the most southern, most western, and most northern of the islands of the Dry Tortugas group, thence northeast on a straight line (045 degrees true) to a point three leagues distant from the line of ordinary low water of the mainland.
The purported unconstitutional conflict between the hereinbefore described portion of the Tortugas shrimp bed or additional nursery area set forth in Section 370.151 (3) (d), F.S., (Ch. 61-470) and the state’s territorial boundaries is more illusory than real when considered in substantial effects. Ch. 61-470 was enacted under the 1885 Constitution which brought forward the 1868 state constitutional boundary.
That there is an ostensible conflict is beyond doubt.
The quoted section of the statute refers to the Florida boundary line in the Gulf of Mexico as being “ * * * a straight line drawn from the Island of Dry Tor-tugas on a bearing of 75° from magnetic north;” whereas that portion of the boundary under the 1962 constitutional amendment reads as follows:
“ * * * and three leagues distant from the Gulf of Mexico coastline of the state to and around the Tortugas Islands; thence northeastwardly, three leagues distant from the coastline, to a point three leagues distant from the coastline of the mainland * * *.”
The alleged violations charged against Appellants for shrimping in the prohibited area occurred during the existence of the boundary description in the 1962 constitutional amendment and of course prior to the latest constitutional description of the State boundary.
It is obvious that in the 1962 revised description of the State’s boundaries there *630 was no “straight line drawn from the Island of Dry Tortugas” as indicated in Section 370.151(3) (d), since the revised constitutional boundary description of 1962 describes that portion of the state boundary as running northeastwardly from the Tor-tugas Islands, “three leagues distant from the [Florida] coastline to a point three leagues distant from the coastline of the mainland.”
The statute cannot alter the territorial boundary line as set forth in the Florida Constitution. The statutory reference, therefore, to the Florida boundary in the Gulf of Mexico as being a straight line drawn from the Island of Dry Tortugas on a bearing of 75° from magnetic north is erroneous. But the Legislature was not attemping to alter any constitutionally described boundary, but rather was attempting to set forth the boundary of the additional nursery area wherein shrimping was prohibited. More appropriately, Section 370.151(3) (d) should have been drafted so as to omit any reference to the Florida boundary line in the Gulf of Mexico. Omitting such reference, the statute would read:
“ * * * thence due north along said meridian longitude 82° 23' to its intersection with a straight line drawn from the Island of Dry Tortugas on a bearing of 75° from magnetic north * * *.”
Clearly the legislative intent was that the boundary of the additional nursery area running north along meridian longitude 82° 23' should intersect with a line drawn from the Island of Dry Tortugas on a bearing of 75° from magnetic north. The erroneous labelling of such line as the Florida boundary should not defeat the legislative intent. Thus construed, the statute is not in conflict with the Florida Constitution.
Irrespective of the boundary question, the state proved that Appellants were shrimping in the statutorily prohibited area, the bounds of which were set forth in the in-formations filed against them. It is not understood that Appellants contend to the contrary, but only that the section of the statute setting forth the boundary of the prohibited area is unconstitutional because of being in conflict with the boundary of the State of Florida Constitution, prescribed in the 1962 constitutional amendment.
In order to establish the exact location of Florida’s official territorial boundary in the area in dispute, the criteria therefor prescribed by the Submerged Lands Act comes into play. It well may be that the 1962 boundary line, described as being three leagues distant extending into the Gulf of Mexico from the coastline of the Tortugas Islands and northeasterly along the coastline of other Florida islands or keys to the mainland, satisfied the Submerged Lands Act and particularly its definitions of “coastline” and “inland waters,” and embraced the additional nursery area described in Section 370.151(3) (d), with its “straight line drawn from the Island of Dry Tortugas on a bearing of 75° from magnetic north.”
If, of course, it is accepted that the 1868 State constitutional boundary has controlled all along, despite the language of the 1962 constitutional amendment boundary (which was adopted out of an abundance of caution, not to sleep on or waive rights of the state by failing to promptly claim them pursuant to the newly validated Submerged Lands Act), the question of whether the nursery area described in F.S. Section 370.151(3) (d), F.S.A., is within the state’s territorial boundary is readily answered in the affirmative. There are strong reasons, both logically and physically, to believe this is the case. There is considerable basis to conclude that the 1868, 1962, and 1968 constitutional territorial boundaries (which are in terms essentially the same) all place the Tortugas shrimp beds within the calls or criteria for determining offshore boundaries of the state under the Submerged Lands Act. The physical circumstances, i. e., the Florida Keys archipelago of numerous islands and out *631 croppings of shoals and mangrove flats, of inland waters, of closed bays, all are indicators the territorial boundaries of Florida are what the State claimed in 1868 and that the Submerged Lands Act confirmed them from that time. In the face of the obvious intent of the constitutional framers of our various territorial boundaries reflected in our State Constitutions, beginning with the boundary in 1868 and continued to this day, we of the State Judiciary should not presume that our State’s territorial boundaries are other than those now claimed by the State. Unless and until it is authoritatively held to the contrary at Federal level that the Submerged Lands Act does not confirm our territorial boundaries to be those claimed by the State on the bases hereinbefore stated, we should not presume or hold otherwise.
The 1962 constitutional amendment, together with relevant preceding historical and contemporaneous considerations growing out of the enactment of the Submerged Lands Act and the litigation to sustain the act, were designed by the State to confirm its claim to the historic boundaries reflected in the 1868 Constitution. Such amendment was in nowise intended to diminish or sur-, render any portion of such historic boundaries. The 1968 constitutional boundary description was adopted to make the State’s claim thereto even more emphatic.
Even if this is not the case and part of the additional shrimp nursery area lies outside the State’s territorial boundaries, the Legislature nevertheless had the power to establish the additional shrimp nursery areas immediately adjacent and outside the State’s territorial boundary in territorial waters. As was said in the dissent in Mounier v. State, (Fla.) 178 So.2d 714:
“But aside from the question concerning where the State’s boundary line may exist within the contemplation of the Submerged Lands Act, its location is immaterial insofar as the disposition of the instant case is concerned. Florida is not necessarily restricted to its legal boundaries as provided in its Constitution and laws as recognized by the Submerged Lands Act in conserving and regulating the taking and manner of taking of fish in coastal waters offshore of Florida and particularly is this true with respect to its own citizens.
“In Skiriotes v. Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193, rehearing denied 313 U.S. 599, 61 S.Ct. 1093, 85 L.Ed. 1552, it was said:
“ ‘ * * * Even if it were assumed that the locus of the offense was outside the territorial waters of Florida, it would not follow that the State could not prohibit its own citizens from the use of the described divers’ equipment [sponge taking equipment] at that place. * * * ’ (text 61 S.Ct. p. 929, 85 L.Ed. p. 1200)
“The Court reaffirmed this statement in United States v. Louisiana, supra, where it cited the Skiriotes case and said:
“ ‘ * * * Some of the acts alleged constituted police power measures which a State can enforce against its citizens beyond its boundaries. * * * ’ (363 U.S. 79, 80 S.Ct. 1004)
“In Manchester v. Commonwealth of Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891), headnotes 5 and 6 read as follows:
“ ‘ 5. The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation and, except so far as any right of control over this territory has been granted to the United States, this control remains with the State.
“ ‘ 6. Within what are recognized by the law of nations as the territorial limits of States, a State can define its boundaries on the sea and the boundaries of its counties; Massachusetts can include Buzzard’s Bay within the limits of its counties.’
*632 “In Louisiana v. Mississippi, 202 U.S. 1, 26 S.Ct. 408, 50 L.Ed. 913, the Court stated:
“ ‘The maritime belt is that part of the sea which, in contradistinction to the open sea, is under the sway of the riparian states, which can exclusively reserve the fishery within their respective maritime belts for their own citizens, whether fish, or pearls, or amber, or other products of the sea. * * * ’
“In United States v. Louisiana, supra, it is stated:
“1 * * * It is recognized, however, that a nation may extend its national authority into the adjacent sea to a limited distance for various purposes. For hundreds of years, nations have asserted the right to fish, to control smuggling, and to enforce sanitary measures within varying distances from their seacoasts. Early in this country’s history, the modern notion had begun to develop that a country is entitled to full territorial jurisdiction over a belt of waters adjoining its coast. However, even this jurisdiction is limited by the right of foreign vessels to innocent passage. * * * ’
“The 4th headnote in Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385, reads:
“ ‘ 4. The preservation of game and fish is within the proper domain of the police power.’
“Admittedly the United States by Act of Congress could extend the admiralty and maritime power of the United States to the conservation of fish life in the subject coastal waters and under the 3rd Article of the Constitution of the United States could extend the jurisdiction of the Federal District Courts to try cases involving violations of such conservation regulations, but this the Congress has not done. See United States v. Bevans, 3 Wheat. 336, 4 L.Ed. 404. It has left this exercise of police power with the State. Appellants seek a judicially declared ‘hiatus’ in the law wherein there will be no regulation.” (178 So.2d 714, at 718-719.)
In Section 370.151, after first describing the Tortugas shrimp beds and the additional nursery beds, certain penalty sections are provided which clearly relate to our nationals or citizens but not to those of other nations. Section 370.151(10), F.S., provides : “This section shall not apply to foreign vessels or any vessel not flying the American flag.”
In enacting F.S. Section 370.151, F.S.A., the Legislature did nót do a vain and useless thing. The nursery bed areas even if. without the State’s constitutional boundaries, are nevertheless extra-territorial areas that the Legislature could constitutionally, and did prescribe for the protection of the State’s interest in the shrimping industry.
The authoritative cases cited just above, Manchester v. Commonwealth of Massachusetts, and Louisiana v. Mississippi, make it clearly manifest that a state under its exercise of the police power can do what Section 370.151 does without having to confine such exercise within the constitutional territorial boundaries of the State of Florida, or the County of Monroe.
It follows, of course, as in Skiriotes, that the State within the jurisdiction of an appropriate court of its political subdivision, Monroe County, may bring on for prosecution violators of the shrimp bed nurseries prescribed in Section 370.151(3) (d). These shrimp beds, even though they may not be within the constitutional territorial boundaries of the State or Monroe County, obviously lie within a marginal belt of the sea adjacent the coast of Florida and the shrimp in these beds and in the salt waters thereon may be protected by the State as a conservation measure promotive of the State’s interest in the shrimp industry.
There is no reason to technically confuse a state’s territorial boundaries wtih special fisheries or marine protective areas in the *633 marginal sea established by the state for the protection of certain marine life and require that the two coincide.
As was said in United States v. State of Louisiana, supra:
“ * * * Early in this country’s history, the modern notion had begun to develop that a country [and in turn a state; Manchester v. Commonwealth of Massachusetts, supra] is entitled to full territorial jurisdiction over a belt of waters adjoining its coast. * * * ”
By enacting F.S. Section 370.151, F.S.A., the Legislature has defined a shrimp protection bed area within the “belt of waters adjoining its [the State’s] coast,” in this case in the salt waters adjacent Monroe County; and the same lies within the enforcement jurisdiction of Monroe County and the trial jurisdiction of its appropriate courts as a political subdivision or instrumentality of the State.
Only recently in Felton v. Hodges, 374 F.2d 337, the United States Fifth Circuit Court of Appeals reconfirmed Skiriotes. It held Florida had sufficient interest in craw-fish, which moved in and out of territorial waters, to enable it to subject one of its citizens to a conservation regulation with respect to taking crawfish beyond the seaward boundary of the State. The Court there said:
“ * * * In our opinion, the added fact that one or more of these arrests may have taken place a few miles outside Florida’s three mile seaward boundary line cannot transmute the otherwise proper efforts of these State officials into a violation of appellant’s constitutional rights.”
Based on Skiriotes and Felton, it is actually not necessary to determine whether Appellants committed the violations within or without the constitutional territorial boundary of the State. For all practical purposes, the shrimp bed area is a part of the State’s territory and the County’s as well, for the special conservation and protection of shrimp in the salt waters adjacent the State. The fact remains Appellants violated a state statute purposely designed to protect the shrimp industry in which the State has a legitimate interest. Even if Appellants committed the acts for which they were charged outside the territorial boundary of the State, they are nevertheless subject to prosecution as nationals or citizens of the State.
To recapitulate:
(a) The additional shrimp nursery bed described by Section 370.151(3) (d), prima facie appears to be within the historic territorial boundaries of the State.
(b) Even if said nursery bed area is not within the historic territorial boundaries of the State, the Legislature had the power, as exercised in Section 370.151, to place such offshore shrimp bed area within the police power jurisdiction of the State to protect the State’s interests in the shrimping industry insofar as the State’s citizens are concerned, pursuant to the Skiriotes and Felton cases. In doing this the Legislature vested jurisdiction in the appropriate court of Monroe County to entertain trial of cases involving prosecution for violations of the statute. Such designated protected shrimp bed areas established for the special purpose of protecting shrimp, were as much under the jurisdiction of the State and Monroe County for such special purpose as if such areas and the salt waters thereover were within the constitutional boundaries of the State and Monroe County.
(c) As a result of the foregoing conclusions, F.S. Section 370.151, F.S.A., is constitutional, and the convictions below should be affirmed.
ADKINS, J., concurs.