DREW, Justice.
Appellants, defendants in the trial court, were tried before a jury and found and adjudicated guilty of shrimping in a prohibited area of the salt waters of Monroe County, Florida, in violation of Section 370.151(3) (d), Florida Statutes (1967), F.S.A. Although tried separately, the causes were consolidated for purposes of oral argument and disposition by this Court. We have jurisdiction because of an initial construction by the trial court of those sections of the Constitutions of 1868, 1885 and 1968 delineating the territorial boundaries of the State of Florida.[1]
In order to conserve the shrimp supply in the Dry Tortugas and Florida Keys area, the Legislature in Section 370.151 established a so-called “nursery area” and an adjacent “additional nursery area” in which no shrimping is permitted at any time except for the production of live bait with which we are not here concerned.[2] The “nursery area” is comprised of that portion of the Gulf of Mexico and Florida Bay lying generally north of the Florida Keys and east of a north-south line drawn through Key West. The “additional nursery area” is comprised of a territory adjacent to and immediately west of the “nursery area,” in the vicinity of the Marquesas Keys.
*623 A triangular-shaped portion of the Gulf lying partially within the “nursery area” and partially within the “additional nursery area” is designated as “the Tortugas shrimp bed” which, as opposed to the remaining portion of the nursery and additional nursery areas, is opened for shrimping by the Department of Conservation when the shrimp therein meet certain criteria established by the statute.[3]
The violations allegedly occurred in the northern portion of the additional nursery area near the area designated as “the Tortugas shrimp bed.” Defendants argued in the trial court and maintain here that they were not shrimping within the territory of Florida as defined in the 1962 revision of Article I of the 1885 Florida Constitution, and that the statutory description of the northern limit of the additional nursery area was erroneous and conflicted wtih the applicable constitutional description, thus rendering the exact northern boundary of the additional nursery area vague and ambiguous.
The northern boundary of the additional nursery area is designated in section 370.151(3) (d) as:
“[T]he Florida boundary line in the Gulf of Mexico, which is a straight line drawn from the Island of Dry Tortugas on a hearing of 75° from magnetic north.’’ [Emphasis added.]
The state concedes that this statutory description of the Florida boundary is erroneous, for no such terms have appeared in the constitution to describe the state’s territorial boundary in this area.[4]
The description of the seaward boundary in the Keys area has varied over the years. The description in Article I of the 1868 Florida Constitution[5] also appeared in Article I of the 1885 Constitution where it remained unchanged until 1962, when by constitutional amendment the description was significantly revised in the wake of the United States Supreme Court’s decision in United States v. States of Louisiana, etc. and Florida.[6] The portion *624 of the boundary in the Keys area was described in the 1962 revision as follows:
“[T]hence down the middle of said [St. Marys] river to the Atlantic Ocean, and extending therein to a point three (3) geographic miles from the Florida coast line, meaning the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters; thence south-eastwardly following a line three (3) geographic miles distance from the Atlantic coast line of the state and three (3) leagues distant from the Gulf of Mexico coast line of the state to and around the Tortugas Islands; thence northeastwardly, three (3) leagues distant from the coast line, to a point three (3) leagues distant from the coast line of the mainland; thence north and north-westwardly, three (3) leagues distant from the coast line, to a point west of the mouth of the Perdido River. * * ”
“The legislature may extend the coastal boundaries to such limits as the laws of the United States or international law may permit.” [Emphasis added.]
The Florida Constitution-1968 Revision, with which we are not here directly concerned, contained a further revised description of the boundary in question.[7] The trial court was of the opinion that regardless of which constitutional description was followed, the entire additional nursery area lay within the boundary of the State of Florida, thereby placing defendants within the state’s territory once they were shown to be within the additional nursery area. The record does not indicate that the trial court ruled which constitutional description was controlling in the cause.
The 1962 revision of the boundary description in Article I of the Florida Constitution of 1885 was adopted at the November 6, 1962, General Election. This revised article was in full force and effect from the first Tuesday after the first Monday of January, 1963, to the effective date of the 1968 Revision of the Constitution, which was the first Tuesday after the first Monday of January, 1969.[8] Thus the boundary of Florida on January 7, 1968, the date of the alleged offenses, was as set forth in the 1962 revision of Article I of the 1885 Florida Constitution.
The state’s position is that since originally designated in the 1868 Constitution the actual boundary location has remained unchanged to this day in spite of successive alterations of the descriptive language. We cannot agree, for it is clear from close examination of the descriptive wording in the respective constitutions that we are not dealing merely with different methods for describing the same boundary. The controlling 1962 revised description uses the terminology “thence northeastwardly, three (3) leagues distant from the coast line,” and thereby refers not to a straight line as in the 1968 revision, but to a line meandering in a general northeasterly direction remaining constantly three leagues distant from the coastline of the Keys *625 until reaching a point three leagues from the coastline of the mainland. Unlike the boundary described in the 1868, 1885 and 1968 Constitutions, such a boundary line could conceivably cut across the additional nursery area in an east-west direction near the alleged locale of defendants’ shrimping activities and place the portion of the additional nursery area in which defendants were shrimping outside the territory of Monroe County and Florida.
The trial court erred by equating the boundary descriptions found in successive constitutions, by finding that the entire additional nursery area was within the State’s territory regardless of which description is employed, and by concluding that there was no valid venue issue relating to whether defendants’ activities were within Monroe County, Florida. The additional nursery area described in Section 370.151(3) (d) extends considerably more than three leagues seaward from the apparent coastline of the Keys. A mere showing that defendants were shrimping within the additional nursery area did not, therefore, necessarily place defendants within the three league territorial boundary of Monroe County and the State of Florida. Because of the trial court’s erroneous ruling, the State was not called upon to prove by competent evidence the actual location of the three league boundary and to show that defendants’ shrimping activities occurred therein as alleged in the informa-tions.
These cases are controlled by our decision in Mounier v. State.[9] The statute under which the indictment was made in Mounier made it unlawful to spearfish “in an area in Monroe County known as the Upper Keys.” The informations against defendants Potter and Bateman in the instant cases were likewise for “shrimping in a prohibited area of the salt waters of Monroe County, Florida * * and the specific allegations recited that each defendant
“[0]n the 7th day of January, in the year of our Lord, one thousand nine hundred sixty-eight, in the County and State aforesaid, was then and there the Master of a certain shrimp vessel * * which was then and there found shrimping in a certain area of the salt waters of Monroe County, Florida, to-wit: in the salt waters of Monroe County, Florida. * * * ”
Because of the mistaken notion of the trial court that there existed no valid issue relating to whether defendants committed the offenses within Monroe County, Florida, no evidence was introduced toward proof of this necessary element. In Mounier the defendant was clearly shown to have carried on his spearfishing outside the boundaries of Monroe County and Florida. Here, there is a lack of proof that defendants were within Monroe County, Florida. The effect is the same: the state has failed to prove that the crime was committed in the county in which the informations were filed and the trials took place. Inasmuch as the Florida Constitution gives to the accused in all criminal prosecutions the right to be tried in the county where the crime was committed,[10] such a failure to prove venue is fatal to these convictions.
*626 The state has urged that the convictions should be affirmed even if the shrimping took place in a prohibited area outside of the territorial limits of Monroe County and Florida, citing Skiriotes v. Florida[11] and Felton v. Hodges[12]. We are here concerned solely with whether the organic law of this state has been satisfied by proof that the alleged criminal offenses occurred within the state and county wherein the informations were filed and the trials held. The Skiriotes and Felton cases did not purport to construe provisions of the Florida Constitution or Florida law disposi-tive of these cases.[13]
It is incumbent upon the state to carry its burden of proving by competent evidence the actual location of the legal territorial boundary of Florida and Monroe County in effect on the date of these offenses;[14] and further, to show by competent evidence that the violations took place within the territory encompassed by that boundary.
These convictions are hereby reversed and the causes remanded for new trials wherein the state must meet the burdens herein prescribed.
It is so ordered.
THORNAL, CARLTON and BOYD, JJ., concur.
ERVIN, C. J., dissents with Opinion.
ADKINS, J., dissents and concurs with ERVIN, C. J.
ROBERTS, J., dissents.

. Fla.Const. art. V, § 4 (1885 as amended). The trial court’s certification to this Court of the boundary question before us now was denied on procedural grounds. State v. Potter, 224 So.2d 291 (Fla.1969).

. Fla.Stat. § 370.151(3) (d), F.S.A. reads as follows:
“(d) There is also established a nursery area in which no shrimping shall be permitted at any time, except live bait production as provided in this chapter. The nursery area thus established is encompassed by a line defined as follows:
“Begin at Coon Key Light in Collier county; thence proceed in a direction of 185° from true north to the Whistle buoy approximately thirteen miles from said Coon Key Light; thence proceed in a direction of 190° from true north to the Quick Flashing Light marking the Wreck buoy which is located at 24° 57' north latitude and 81° 46' west longitude; thence proceed in a direction of 248° from true north until the eighty-second meridian is reached; then proceed 180° from true north along said eighty-second meridian until 24° 35' north latitude is reached ; thence proceed in a direction of 90° from true north until 81° 30' west longitude is reached; thence proceed in a direction 71° from true north until a point 24° 49' north latitude and 80° 47' west longitude is reached; thence proceed in a direction 53° from true north until a point at 25° north latitude and 80° 30' west longitude is reached; thence proceed in a direction true north until the mainland of Florida is reached; thence proceed west and north along the coast of mainland Florida until a point on the mainland is reached which is located exactly north of aforementioned Coon Key Light located in Collier county; thence proceed true south (180° from true north) until Coon Key Light (the point of beginning) is reached.
“There is also established an additional nursery area described as follows :
“Beginning at the intersection of the Florida boundary line in the straits of Florida with the meridian longitude 82° 00' west of Greenwich; running thence westerly along said Florida boundary line in the straits of Florida to the meridian longitude 82° 23' west of Greenwich; running thence due north along said meridian longitude 82° 23' to its intersection with the Florida boundary line in the Gulf of Mexico, which is a straight line drawn from the Island of Dry Tortugas on a bearing of 75° from magnetic north; running thence easterly along said Florida boundary line to its intersection with said meridian longitude 82° 09'; running thence southerly along said meridian longitude 82° 00' to the point of beginning.
“Except that in all nursery areas established, those areas designated as Tortugas shrimp grounds, as above described, shall be open to fishing when the shrimp are large enough as prescribed in this chapter.”

.Fla.Stat. § 370.151(2), F.S.A. reads as follows:
“ (2) The Tortugas shrimp bed is hereby defined as follows:
“Begin at Quick Flashing Wreck buoy located at 24° 57' north latitude and 81° 46' west longitude; thence proceed in a direction 248° from true north, until 82° west longitude is reached; thence proceed in a direction 255° from true north until 82° 23' west longitude and 24° 46' north latitude is reached; thence proceed in a direction 90° from true north until the 82° meridian west longitude is reached; thence proceed in a direction 48° from true north until the Quick Flashing Wreck buoy is reached which is the point of beginning.
“For the purpose of permitting fishing or prohibiting fishing as related to the size of shrimp, those portions of the Tortugas shrimp beds which lie east of the 82° meridian west longitude may be considered separately from those lying west of said meridian.”
This area was closed on the date of the alleged infractions, thus placing it in the same status as the remainder of the additional nursery area.

. We note that in the original description of the Tortugas shrimp bed contained in Section 370.151(2) as passed by the 1957 Legislature, the Florida boundary line in the Gulf of Mexico was described as “a straight line drawn from the island of Dry Tortugas on a bearing of 75° from magnetic north. * * * ” This description was evidently followed by the drafters of the 1961 amendment establishing the “additional nursery area” in § 370.151(3) (d).

. “[T] hence southwestwardly along the edge of the Gulfstream and Florida Reefs to and including the Tortugas Islands ; thence northeastwardly to a point three leagues from the mainland; thence northwestwardly three leagues from the land * * [Emphasis added.] Fla. Const, art. I (1868).

. 363 Ü.S. 121, 80 S.Ct. 961, 1026, 4 L.Ed. 2d 1025, 1096 (1960).

. Fla.Const. art. II, § 1 (1968 Revision): “[T] hence in a southerly direction along the edge of the Gulf Stream or along a line three geographic miles from the Atlantic coastline and three leagues distant from the Gulf of Mexico coastline, whichever is greater, to and through the Straits of Florida and westerly, including the Florida reefs, to a point due south of the three leagues from the southernmost point of the Marquesas Keys; thence westerly along a straight line to a point due south of and three leagues from Loggerhead Key, the westernmost of the Dry Tortugas Islands; thence westerly, northerly and easterly along the arc of a curve three leagues distant from Loggerhead Key to a point due north of Loggerhead Key; thence northeast along a straight line to a point three leagues from the coastline of Florida; thence northerly and westerly three leagues distant from the coastline * * [Emphasis added.]

. Fla.Const. art. XVII, § 4 (1885 as amended); In re Advisory Opinion to the Governor, 217 So.2d 289 (Fla.1968).

. 178 So.2d 714 (Fla.1965). For general discussion of related boundary questions, see A. Gross, The Maritime Boundaries of the States, 64 Mich,L.Rev. 639 (1966), and D. Cowan, Era of Militant Fishing Jurisdiction — A Study of the Florida Territorial Waters Act of 1963, Miami L.Rev. 160 (1968).

. Fla.Const.Deel. of Rights, § 11 (1885), F.S.A.: “In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury, in the county where the crime was committed" [emphasis added]. U.S.Const. amendment VI: “In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the *626 witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.”

. 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193, rehearing denied, 313 U.S. 599, 61 S.Ct. 1093, 85 L.Ed. 1552 (1941).

. 374 F.2d 337 (5th Cir. 1967).

. Fla.Const.Decl. of Rights, § 12 (1885). See also Fla.Stat. §§ 910.03, .08, F.S.A.

. For a discussion of the difficulties which may be encountered in setting a state’s seaward territorial limit, see A. Gross, The Maritime Boundaries of the States, 64 Mich.L.Rev. 639 (1966).